MJC/LJW201700153

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2019 NOV -6 PM 3: 37

CLERK'S OFFICE
AT BALTIMORE
BY_____DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

RRH
11/4/19

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **UNDER SEAL** |
| | : | |
| v. | : | Criminal No. DKC-19-0524 |
| | : | |
| GARY BROWN, JR., | : | **(Conspiracy to Commit Wire Fraud,** |
| | : | **18 U.S.C. § 1349; Conspiracy to** |
| Defendant. | : | **Defraud the United States, 18 U.S.C** |
| | : | **§ 371; Filing a False Tax Return, 26** |
| | : | **U.S.C. § 7206(1); Forfeiture, 18 U.S.C.** |
| | . : | **§ 982(a)(2)(A))** |
| | : | |

...oOo...

## INFORMATION

## COUNT ONE

### (Conspiracy to Commit Wire Fraud)

The United States Attorney for the District of Maryland charges that:

### INTRODUCTION

At all times relevant to this Information:

1.     CATHERINE ELIZABETH PUGH ("PUGH") was a resident of Baltimore, Maryland.

2.     From approximately 2006 until 2015, PUGH was a senator in the Maryland State Senate where she served on various legislative committees, including the Senate Health Committee.  PUGH won her seat in the Senate after elections held in 2010 and 2014.  In 2011, PUGH campaigned to become the mayor of Baltimore City, but lost in the primary election on September 13, 2011.  In September 2015, PUGH announced her intention to run again for mayor of Baltimore City.  After winning the primary election on April 26, 2016, and the general election on November 8, 2016, PUGH assumed the position of mayor of Baltimore City on December 6,

2016.

3.      PUGH was the sole owner of Healthy Holly, LLC ("Healthy Holly"), a company formed in Maryland on January 14, 2011.  PUGH used the company to publish and sell children's books that she had written.  Healthy Holly's principal business address was PUGH's residence in Baltimore, Maryland.

4.      On or about the following dates, Healthy Holly published four illustrated children's books: (1) June 21, 2011, *Healthy Holly: Exercising is Fun*; (2) March 8, 2013, *Healthy Holly: A Healthy Start for Herbie*; (3) August 25, 2015, *Healthy Holly: Fruits Come in Colors Like the Rainbow*; and (4) August 18, 2017, *Healthy Holly: Vegetables are not just Green*.  The cover of each book listed "Catherine Pugh" as the author.  The overwhelming number of books published by Healthy Holly were not sold through retail or wholesale vendors; rather, they were marketed and sold directly to non-profit organizations and foundations, many of whom did business or attempted to do business with Maryland state government and Baltimore City.

5.      Catherine E. Pugh and Company, Inc. (the "Pugh Company"), was a marketing and public relations consulting company organized in Maryland in 1997.  PUGH was the sole proprietor of the business, and its principal address was her residence in Baltimore, Maryland.

6.      PUGH was the sole signatory on Healthy Holly's bank account ending in 8269 and the Pugh Company's bank account ending in 1653.  PUGH did not maintain a personal bank account, choosing instead to commingle her personal and business finances in her business accounts.

7.      PUGH filed U.S. Individual Income Tax Return, Form 1040, for tax years 2015 and 2016, which included Internal Revenue Service ("IRS") Form Schedule C, Profit or Loss From a Business (Sole Proprietorship).  PUGH used Form Schedule C to calculate the net taxable business income she received from Healthy Holly during those years.

2

8. Defendant **GARY BROWN, JR. ("BROWN")** was a resident of Baltimore, Maryland.

9. **BROWN** served as a legislative aide to PUGH when she was a state senator. **BROWN** served as a campaign aide to PUGH during her 2016 mayoral election campaign. Following PUGH's election as mayor of Baltimore City in November 2016, **BROWN** was hired as the Deputy Director of Special Events in the mayor's office. **BROWN** had an office in City Hall on the same floor as PUGH. In December 2016, the Maryland Democratic Central Committee nominated **BROWN** to fill a vacancy in the Maryland House of Delegates created by PUGH's mayoral victory.

10. **BROWN** was the sole owner and operator of Stricker Abstracting, LLC, and GB Abstracting, LLC - two Maryland companies that purported to be title-abstracting businesses. **BROWN** was the sole owner and operator of a Maryland consulting business called GBJ Consulting, LLC. **BROWN** ran all three companies from his residence. **BROWN** also freelanced as a tax return preparer.

11. **BROWN** helped PUGH solicit non-profit organizations and foundations to purchase children's books published by Healthy Holly. **BROWN** also assisted PUGH in the transportation and storage of Healthy Holly books, and the drafting of invoices and other documents to account for book sales. The assistance **BROWN** provided to PUGH in the promotion and distribution of Healthy Holly books sometimes took place during work hours while **BROWN** was serving as PUGH's legislative aide and mayoral staff member. **BROWN** referred to himself as Healthy Holly's Chief Operating Officer; however, **BROWN** was not an employee of Healthy Holly. None of **BROWN's** companies actually provided services to or on behalf of Healthy Holly.

12. **BROWN** filed U.S. Individual Income Tax Return, Form 1040, for tax year 2016,

3

which included IRS Form Schedule C, Profit or Loss From a Business (Sole Proprietorship). **BROWN** used Form Schedule C to calculate the net taxable business income from his companies for those years, including income purportedly received for services rendered on behalf of Healthy Holly.

13. PUGH caused Healthy Holly to issue a 2016 IRS Form 1099 to report approximately $64,325 in payments to **BROWN's** company, GBJ Consulting, for purported "outside services" that his company provided to Healthy Holly.

14. The Internal Revenue Service of the Department of Treasury ("IRS") was an agency of the United States government responsible for enforcing the nation's revenue laws and collecting federal income taxes.

### The Scheme to Defraud

15. From in or about November 2011 until in or about March 2019, in the District of Maryland and elsewhere, the defendant,

### GARY BROWN, JR.,

did knowingly devise and intend to devise a scheme and artifice to defraud purchasers of Healthy Holly books and to obtain money and property from such purchasers by means of materially false and fraudulent pretenses, representations, and promises, that is, the defendant promised to print and deliver books commensurate with what purchasers paid for them when, in truth and fact, the defendant accepted payments with the intent to (1) not provide the books to purchasers, (2) print and provide the books to purchasers, but later convert the books to his own personal use, and (3) provide purchasers with books that had already been sold and delivered to a different purchaser (hereinafter, "the scheme to defraud").

## The Conspiracy Charge

16.     From in or about November 2011 until in or about March 2019, in the District of Maryland and elsewhere, the defendant,

### GARY BROWN, JR.,

did knowingly and willfully conspire, combine, confederate, and agree with PUGH to commit wire fraud, that is, to knowingly execute and attempt to execute the scheme to defraud through the use of interstate wires in violation of Title 18, United States Code, Section 1343.

## The Purpose of the Conspiracy

17.     The purpose of the conspiracy to defraud was for PUGH and **BROWN** to unlawfully enrich themselves, promote PUGH's political career, and fund her electoral campaign for mayor.

## Manner and Means of the Conspiracy

It was part of the conspiracy to defraud that:

18.     PUGH and **BROWN** falsely promised to sell and deliver an agreed-upon quantity of Healthy Holly books to organizations at a certain price per book.   After accepting payments for the books, PUGH and **BROWN** intentionally did not deliver the books as promised.

19.     After accepting payments for Healthy Holly books and delivering them to a third party on behalf of a purchaser, PUGH and **BROWN** converted some or all of the purchased books to their own use without the purchaser's or third party's knowledge and consent, thereby fraudulently acquiring an inventory of books at no cost to PUGH and **BROWN**.

20.     PUGH and **BROWN** stored quantities of fraudulently obtained Healthy Holly books at various locations, including PUGH's residence in Baltimore City; PUGH's state legislative offices in Annapolis and Baltimore City; PUGH's mayoral office at City Hall; the War

Memorial building in Baltimore City; and a public storage locker used by PUGH's mayoral campaign.

21.     As a way to promote PUGH, her books and her political campaigns, PUGH and **BROWN** gave away fraudulently obtained Healthy Holly books during government functions and campaign events, sometimes with the assistance of other members of PUGH's legislative and mayoral staffs.

22.     PUGH and **BROWN** intentionally double-sold Healthy Holly books by selling books purchased by one buyer to a different buyer without either buyer's knowledge or consent.

23.     PUGH used some of the proceeds from the sale of fraudulently obtained Healthy Holly books to fund straw donations to PUGH's mayoral election campaign, funds that **BROWN** caused to be deposited into the bank account for the "Committee to Elect Catherine E. Pugh."

24.     PUGH and **BROWN** used other members of PUGH's legislative and mayoral staffs to facilitate the sale and delivery of fraudulently obtained Healthy Holly books, including the acquisition and transportation of books that had been in storage at a warehouse used by the Baltimore City Public Schools.

25.     PUGH used some of the proceeds from the sale of fraudulently obtained Healthy Holly books to fund the purchase and renovation of a house in Baltimore City.

26.     PUGH and **BROWN** transmitted and caused to be transmitted interstate wire communications during and in furtherance of the negotiation, sale, and delivery of fraudulently obtained Healthy Holly books.

## Acts in Furtherance of the Conspiracy

### I.   The Fraudulent Conversion of Books Sold to Purchaser A

#### A.   The Printing and Sale of Book One

27.    In or about December 2010, PUGH negotiated the sale of 20,000 Healthy Holly books for $100,000 to Purchaser A, a nonprofit healthcare organization based in Maryland.    The book was titled *Healthy Holly: Exercising is Fun* ("Book One").    At PUGH's suggestion, Purchaser A agreed to buy Book One on the condition that the purchase be on behalf of, and for distribution to, school children in the Baltimore City Public Schools ("BCPS" or "the school system").    The purchase was also contingent on PUGH delivering the donated books to the school system for distribution to students.

28.    In or about January 2011, PUGH approached the Chief Executive Officer for BCPS about accepting the donation of Book One from Purchaser A.    The BCPS CEO agreed to accept the books, but first had members of his staff copy-edit the book.    The BCPS staff identified various grammatical and spelling errors, which PUGH corrected.    The BCPS CEO decided not to make the book part of the curriculum; instead, the BCPS CEO authorized giving a copy of the book to all age-appropriate students for the students to take home.    PUGH helped arrange a letter of agreement between Purchaser A and BCPS regarding the donation of Book One.

29.    On or about February 17, 2011 and May 20, 2011, PUGH accepted and endorsed two $50,000 checks from Purchaser A for the sale of Book One.    The checks were deposited into a bank account designated by PUGH.    On March 11, 2011, **BROWN** emailed a "corrected invoice" to Purchaser A.

30.    On or about March 2, 2011 and June 2, 2011, PUGH paid a printing company a total of $13,480 to print and deliver 22,110 copies of Book One, which was the only edition of Book One ever printed.    PUGH made arrangements to have approximately 20,020 copies of the

books delivered to the Baltimore City Board of Education at 200 E. North Ave., Baltimore, Maryland, and another 2,090 copies of the books delivered to "Senator Catherine E. Pugh" at her legislative office located at 2901 Druid Park Drive, Suite 200C, Baltimore, Maryland.

31. On or about June 6, 2011, the 20,020 copies of Book One were delivered to the mail room at 200 E. North Avenue, Baltimore, Maryland. BCPS employees moved the books to a warehouse used by the school system located at 5300 Pulaski Highway, Baltimore, Maryland ("City Warehouse").

32. Beginning in or about October 2011, PUGH and **BROWN** arranged for thousands of copies of Book One to be removed from the City Warehouse for PUGH's personal use and benefit. Sometimes **BROWN** enlisted the help of a Baltimore City employee to remove and transport the books. On other occasions, PUGH paid associates of **BROWN** to remove and transport the books. PUGH and **BROWN** arranged for the books to be delivered to various locations in Baltimore City where they were stored, including PUGH's residence in Baltimore City; PUGH's state legislative offices in Annapolis and Baltimore City; PUGH's mayoral office at City Hall; the War Memorial building in Baltimore City; a public storage locker used by PUGH's mayoral campaign; PUGH's personal and governmental vehicles; and vehicles belonging to **BROWN** and other members of PUGH's staff. PUGH and **BROWN** used the cached copies as giveaways at various events in order to promote Book One and PUGH's political campaigns. Neither Purchaser A nor the BCPS authorized PUGH's and **BROWN's** conversion of Book One to their own use.

**B.      The Fraudulent Delivery of Book Two to PUGH's Legislative Office**

33. On or about August 22, 2012, PUGH negotiated the sale of 20,000 more Healthy Holly books to Purchaser A for $100,000. The title of the second book was *Healthy Holly: A Healthy Start for Herbie* ("Book Two"). As with the first purchase, Purchaser A agreed to buy

8

Book Two on behalf of, and for distribution to, BCPS school children. The purchase of Book Two was also contingent on PUGH delivering the donated books to the school system for distribution to the students. During discussions with Purchaser A about the sale of Book Two, PUGH failed to disclose the fact that Book One had not been distributed to BCPS students in accordance with the terms of its purchase.

34.    In or about August of 2012, the BCPS CEO agreed to accept Purchaser A's donation of 20,000 copies of Book Two. Members of the CEO's staff identified grammatical and spelling errors, which PUGH corrected. The BCPS CEO decided to give a copy of the non-instructional book to all age-appropriate students for them to take home. PUGH helped arrange a letter of agreement between Purchaser A and the school system regarding the donation of Book Two.

35.    On or about July 10, 2012, **BROWN** emailed an invoice to Purchaser A for 20,000 copies of Book Two. On or about November 6, 2012, Purchaser A gave PUGH a $100,000 check payable to Healthy Holly for the purchase of 20,000 copies of Book Two. PUGH deposited the check into Healthy Holly's bank account on November 19, 2012.

36.    On or about December 12, 2012, PUGH sent an email from cepughco@aol.com with instructions for the publisher about how to split up the order, stating, "Let's make that 18500 [for the] schools and 1500 [for] Me."

37.    On or about December 19, 2012 and March 20, 2013, PUGH issued two Healthy Holly checks to pay a printing company a total of $14,325 to print and deliver 20,100 copies of Book Two, which was the only edition of Book Two ever printed. PUGH made arrangements to have 18,600 copies of the books delivered to the Baltimore City Board of Education at 200 E. North Ave., Baltimore, Maryland, and another 1,400 of the books delivered to "Senator Catherine

E. Pugh" at her legislative office located at 2901 Druid Park Drive, Suite 200C, Baltimore, Maryland. The books were distributed to the respective locations on or about March 19, 2013.

38. Purchaser A had no knowledge that PUGH had delivered 1,400 copies of its books to PUGH's legislative office instead of giving them to the school system. In so doing, PUGH unlawfully converted 1,400 copies of Book Two to her own personal use without Purchaser A's consent. The fraudulent conversion provided PUGH and **BROWN** with a free inventory of books that they used as giveaways at various events in order to promote Book Two and PUGH's political campaigns.

## C. The Fraudulent Delivery of Book Three to PUGH's Legislative Office

39. On or about January 24, 2015, PUGH negotiated the sale of 20,000 more Healthy Holly books to Purchaser A for $100,000. The title of the third book was *Healthy Holly: Fruits Come in Colors Like the Rainbow* ("Book Three"). As with the first two purchases, Purchaser A agreed to buy Book Three on behalf of, and for distribution to, BCPS school children, and PUGH agreed to deliver them. During discussions with Purchaser A about the sale of Book Three, PUGH failed to disclose the fact that Books One and Two were not distributed to BCPS students in accordance with the terms of those purchases.

40. On or about January 26, 2015, **BROWN** emailed an invoice to Purchaser A for 20,000 copies of Book Three. On or about March 18, 2015, Purchaser A gave PUGH a $100,000 check payable to Healthy Holly for the purchase of Book Three. PUGH deposited the check into Healthy Holly's bank account on April 23, 2015.

41. On or about June 5, 2015 and August 2, 2015, PUGH paid a printing company a total of $15,275 to print and deliver 21,000 copies of Book Three, which was the only edition of Book Three ever printed. PUGH made arrangements to have 19,500 copies of the books delivered to the Baltimore City Board of Education at 200 E. North Ave., Baltimore, Maryland,

and another 500 copies of the books delivered to "Senator Catherine E. Pugh" at her legislative office located at 2901 Druid Park Drive, Suite 200C, Baltimore, Maryland. The books were distributed to the respective locations on or about September 4, 2015.

42. Purchaser A had no knowledge that PUGH had delivered 500 copies of its books to PUGH's legislative office instead of giving them to the school system. In so doing, PUGH unlawfully converted 500 copies of Book Three to her own personal use without Purchaser A's consent. The fraudulent conversion provided PUGH and **BROWN** with a free inventory of books that they used as giveaways at various events to promote Book Three and PUGH's mayoral campaign.

### D. The Fraudulent Resale of Books One, Two, and Three to Other Purchasers

43. Beginning in or about October 2011, PUGH and **BROWN** began selling to unwitting purchasers copies of Healthy Holly Books One, Two and Three, which had already been sold to Purchaser A and donated to BCPS. To that end, PUGH and **BROWN** used a Baltimore-based public charity ("Charity") to facilitate the resale and distribution of the books to new purchasers. The new purchasers entered into an agreement with PUGH whereby they agreed to buy Healthy Holly books through the Charity to support a worthy cause. Neither the Charity nor the new purchasers knew that PUGH and **BROWN** were double selling the books.

44. Pursuant to the Charity's agreement with PUGH, the Charity kept a percentage of the purchase price paid by the new purchasers, and forwarded the balance to PUGH. PUGH then had copies of the books delivered to the Charity, which, in turn, agreed to deliver the books to children's programs on behalf of the new purchasers. **BROWN** facilitated the delivery of the books from either the City Warehouse or PUGH's legislative offices.

11

### 1. The Resale of Book One to Purchaser B

45.    On or about October 7, 2011, PUGH discussed the sale of Healthy Holly books with Purchaser B, a nonprofit healthcare insurer based in the Baltimore-Washington DC area. Purchaser B agreed to buy the books through the Charity for $7,000. On or about October 24, 2011, Purchaser B sent the Charity a check for $7,000. The Charity retained $1,000 of the payment and forwarded $6,000 to PUGH, which PUGH applied to pay down a home equity line of credit. To fill the book order, on or about November 27, 2011, PUGH and **BROWN** took 1,000 copies of Book One from the shipment of books that Purchaser A had donated to the school system in June 2011. Neither Purchaser A nor the Baltimore City Public Schools authorized the fraudulent resale of those books to Purchaser B. **BROWN** delivered the 1,000 copies of Book One to the Charity, which, in turn, delivered them to daycare centers.

### 2. The Resale of Book Two to Purchaser C

46.    On or about August 27, 2013, PUGH called the President and CEO of the Charity to say that three organizations had agreed to purchase copies of PUGH's "second children's book." PUGH told the Charity that Purchaser B had agreed to buy 1,000 copies; Purchaser C, an automobile insurance fund based in Maryland, had agreed to buy 1,000 copies; and Purchaser D, an investment firm with offices in Chicago, had agreed to purchase 400 copies.

47.    On or about August 29, 2013, PUGH texted the President and CEO of the Charity to confirm that Purchaser C would be sending a check to the Charity to buy "one thousans [sic] books." PUGH confirmed that the Charity would "deduct $1,000" from the payment for itself and the balance would be given to PUGH via a check payable to Healthy Holly, which she would "pick up." Ultimately, Purchaser C paid the Charity $5,000 for the purchase of only 556 copies of Book Two. The Charity kept $552 of the payment and gave PUGH the balance via a check

for $4,448 payable to Healthy Holly, which PUGH deposited into Healthy Holly's bank account on or about October 14, 2013.

48.     PUGH advised the Charity that she would deliver Purchaser C's books to daycare centers instead of having the Charity handle the delivery.   However, the only source of 1,000 copies of Book Two to fill Purchaser C's book order was the shipment of Book Two that Purchaser A had donated to the school system in March 2013.   Neither Purchaser A nor BCPS authorized the fraudulent resale of those books to Purchaser C.

### 3.     The Resale of Books One and Two to Purchaser D

49.     On or about August 6, 2013, a member of PUGH's legislative staff helped coordinate the sale of 400 Healthy Holly books to Purchaser D.   As the sponsor of the 2013 Black Corporate Director's Conference to be held on September 6-8, 2013, in Laguna Beach, California, Purchaser D wanted to include a copy of the books in its "swag" gift bag to be handed out to conference attendees.   PUGH told Purchaser D to order the books through the Charity's CEO.

50.     On or about August 12, 2013, PUGH arranged for the delivery of 400 Healthy Books to Purchaser D, which included 200 copies of Book One and 200 copies of Book Two.   A member of PUGH's legislative staff sent confirmation of the delivery to Purchaser D via email account "Catherine.Pugh@senate.state.md.us."   A copy of each book, valued at $9 per book, was included in the gift bags that were handed out at the conference.   The conference agenda listed "State Senator Catherine E. Pugh" as one of the panelists.   Purchaser D paid PUGH's travel and lodging expenses totaling approximately $4,664.

51.     On or about September 12, 2013, PUGH sent a Healthy Holly invoice to Purchaser D seeking payment for the shipped copies of "Healthy Holly: Exercising is Fun!" and "Healthy Holly: A Healthy Start For Herbie."   The invoice directed all inquiries to **BROWN** and requested that a check be made payable to "[the Charity] Attn: Healthy Holly."   On or about September 26,

2013, a legislative staff member sent an email to Purchaser D stating, "Senator Pugh wanted to get an update for the payment that will be going to [the Charity] for the books."

52.     On or about October 4, 2013, Purchaser D sent a check to the Charity for $3,680. On or about October 17, 2013, the Charity forwarded the full amount to PUGH via a check payable to Healthy Holly, which PUGH deposited into the company's bank account on October 24, 2013.

53.     To fill the book order for Purchaser D, PUGH took 200 copies of Book One from the shipment of books that Purchaser A had donated to the school system in June 2011, and 200 copies of Book Two from the shipment of books that Purchaser A had donated to the school system in March 2013.   Neither Purchaser A nor BCPS authorized the fraudulent resale of the books to Purchaser D.

### 4.     The Resale of Book Two to Purchaser B

54.     On or about December 3, 2013, PUGH contacted Purchaser B about purchasing 1,000 copies of Book Two through the Charity for $7,500.   On or about February 12, 2014, Purchaser B issued a $7,500 check to the Charity to buy the books.   The Charity kept $1,000 of the payment, and forwarded the balance of $6,500 to PUGH via a check made payable to Healthy Holly, which PUGH deposited into the company's bank account on March 26, 2014.   **BROWN** delivered the 1,000 copies of Book Two to the Charity, which, in turn, delivered most of them to youth-related organizations.

55.     To fill Purchaser B's book order, PUGH and **BROWN** took 1,000 copies of Book Two from the shipment of books that Purchaser A had donated to the school system in March 2013.   Neither Purchaser A nor BCPS authorized the fraudulent resale of those books to Purchaser B.

### 5. The Resale of Book Three to Purchaser E

56.     On or about December 14, 2016, Purchaser E, a trust fund based in Maryland, sent the Charity a check for $50,000, which the charity used to purchase 5,000 copies of Healthy Holly books.    On or about December 22, 2016, **BROWN** issued an invoice to the Charity requesting a payment of $45,000 for an "assortment of books," which took into account the price of the books minus the Charity's fee of $5,000.    On or about December 23, 2016, the charity sent PUGH a $45,000 check payable to Healthy Holly, which PUGH deposited into the company's bank account on or about December 28, 2016.

57.     **BROWN** delivered 500 copies of Book Three to the Charity, which the Charity then distributed to an affiliate office for further distribution to youth-related groups.    In reference to the other 4,500 books donated by Purchaser E, the Charity requested an explanation from PUGH about how the books were going to be distributed.    On or about February 1, 2017, **BROWN** sent the Charity a letter claiming that "Healthy Holly LLC will be delivering 5000 [copies of] *Healthy Holly: Fruit [sic] Come in the Colors Like the Rainbow* [Book Three] to the Baltimore City Public Schools."    The letter noted that the books would be delivered to the City Warehouse so the school system could "distribut[e] the books to their students."

58.     To fill the book order for Purchaser E, PUGH and **BROWN** converted 5,000 copies of Book Three from the shipment of books that Purchaser A had donated to the school system back in August 2015 - books that had already been delivered to the City Warehouse.    Neither Purchaser A nor BCPS authorized the fraudulent resale of those books to Purchaser E.

### 6. The Resale of Books One, Two, and Three to Purchaser F

59.     On or about December 17, 2015, PUGH discussed the sale of Healthy Holly Books with Purchaser F, a nonprofit healthcare foundation with offices in Maryland.    Purchaser F agreed to purchase the books as part of its community outreach program, which included giving away free

literature at events that promoted healthy lifestyles. On or about December 21, 2015, **BROWN** sent Purchaser F a Healthy Holly invoice seeking $25,000 for 5,000 unspecified Healthy Holly books. Purchaser F sent PUGH a $25,000 check payable to Healthy Holly on January 21, 2016, which PUGH deposited into the company's bank account on February 1, 2016. On or about June 27, 2016, **BROWN** sent Purchaser F another Healthy Holly invoice seeking $25,000 for 5,000 more unspecified Healthy Holly books. Purchaser F sent PUGH a $25,000 check payable to Healthy Holly on or about September 13, 2016, which PUGH deposited into the company's bank account on or about September 19, 2016.

60. To fill the foregoing book orders totaling 10,000 books, PUGH and **BROWN** took approximately 1,000 copies of Book One from the shipment of books that Purchaser A had donated to BCPS in June 2011; approximately 1,000 copies of Book Two from the shipment of books that Purchaser A had donated to the school system in March 2013; and approximately 7,500 from the shipment of books that Purchaser A had donated to the school system in August 2015. - Neither Purchaser A nor BCPS authorized the fraudulent resale of those books to Purchaser F. **BROWN** facilitated the delivery of the books to Purchaser F's offsite storage facility.

## II. False Promises to Induce Advance Payments for Books Never Delivered

### A. The Non-Delivery of Book Two to Purchaser C

61. On or about August 2, 2012, PUGH negotiated the sale of 1,000 copies of Book Two to Purchaser C via the Charity for $7,500. On or about August 20, 2012, the Executive Director for Purchaser C sent an internal memo authorizing the purchase of the books via the Charity using funds from the company's charitable-distributions budget. However, on or about August 24, 2012, Purchaser C sent PUGH a $7,500 check made payable to Healthy Holly instead of the Charity. PUGH deposited the check into Healthy Holly's account on September 7, 2012. The Charity did not receive a percentage of the sale. Neither the Charity nor Purchaser C ever

received the 1,000 copies of Book Two for further distribution to a charitable cause.

### B. The Non-Delivery of Books Four and Five to Purchaser F

62. On or about October 16, 2017, the Director of Community Health for Purchaser F had a conversation with PUGH about obtaining copies of Book Four, titled *Healthy Holly: Vegetables are not just* [sic] *Green,* to hand out at various community events. That same day, members of PUGH's mayoral staff sent an email to the Director discussing how to get copies of the book and asking for details about Purchaser F's plan to have PUGH attend the company's upcoming community events to sign her books and conduct a reading.

63. On or about October 31, 2017, **BROWN** sent Purchaser F a message from email account healthyholly@healthyholly.com with an attached invoice seeking payment of $14,000 for 2,000 copies of Book Four. On or about November 24, 2017, Purchaser F sent PUGH a check for $14,000 made payable to Healthy Holly, which PUGH deposited into the Healthy Holly bank account on or about November 30, 2017. However, PUGH and **BROWN** never delivered the 2,000 copies of Book Four to Purchaser F. In addition, one year later, on or about October 21, 2018, **BROWN** sent a new invoice to Purchaser F seeking $25,000 for 4,000 copies of an unpublished Healthy Holly book (Book Five) to be titled *Healthy Holly: Walking with My Family is Fun.* Not knowing about the non-delivery of Book Four, Purchaser F sent PUGH a $25,000 ACH payment to Healthy Holly's account to pay for Book Five. PUGH and **BROWN** never delivered copies of Book Five to Purchaser F.

### C. The Non-Delivery of Books Four and Five to Purchaser A

64. On or about October 17, 2016, PUGH negotiated the sale of 20,000 copies of Book Four to Purchaser A for $100,000. During discussions with Purchaser A about the sale of Book Four, PUGH failed to disclose the fact that the first three books were not distributed to BCPS students in accordance with the terms of those purchases. More specifically, PUGH never told

Purchaser A about the fraudulent acquisition and use of those books over the preceding five years, including PUGH's and **BROWN**'s diversion of books to PUGH'S legislative offices, the use of the books as promotional and political giveaways, and the resale of thousands of books to new purchasers for their own financial gain. On or about October 17, 2016, **BROWN** emailed Purchaser A an invoice seeking $100,000 for 20,000 copies of Book Four.

65.     On or about November 3, 2016, Purchaser A sent PUGH a check for $100,000 payable to Healthy Holly for the purchase and delivery of 20,000 copies of Book Four on behalf of BCPS. PUGH deposited the check into Healthy Holly's bank account on November 9, 2016, part of which PUGH used to purchase a new house on December 13, 2016. However, as of April 2019, PUGH and **BROWN** never delivered nor printed the 20,000 copies of Book Four for which Healthy Holly had been paid.

66.     On or about September 12, 2018, PUGH approached Purchaser A about buying 20,000 copies of a new Healthy Holly book (Book Five) for $100,000. During those discussions, PUGH failed to disclose the fact that the first four books were not distributed to BCPS students in accordance with the terms of those purchases. On or about September 12, 2018, **BROWN** emailed Purchaser A an invoice seeking $100,000 for 20,000 copies of Book Five. On or about November 14, 2016, Purchaser A sent PUGH a check for $100,000 payable to Healthy Holly for the purchase and delivery of 20,000 copies of Book Five on behalf of BCPS. On or about November 27, 2018, PUGH deposited the check into Healthy Holly's account. PUGH and **BROWN** never delivered nor printed the 20,000 copies of Book Five for which Healthy Holly had been paid.

18 U.S.C. § 1349

## COUNT TWO

### (Conspiracy with PUGH to Defraud the United States)

The United States Attorney for the District of Maryland further charges that:

1.    Paragraphs 1 through 14 of Count One are realleged and incorporated by reference as though fully set forth in this Count.

### A.    The Misrepresentation of Campaign Donations as Healthy Holly Business Expenses

2.    During calendar year 2016, Healthy Holly received approximately $345,000 from the sale of Healthy Holly books.    PUGH deposited the sale proceeds into the Healthy Holly bank account.

3.    **BROWN** formed GBJ Consulting on or about February 5, 2016.    The Articles of Organization listed the purpose of GBJ Consulting as "Fundraising and Political Consulting."

4.    On or about July 29, 2016, **BROWN** opened a bank account in the name of GBJ Consulting.

5.    On or about March 19, 2018, PUGH filed a U.S. Individual Income Tax Return, Form 1040, for tax year 2016, which included Form Schedule C to report Healthy Holly's profit or loss for that year.    On Schedule C, PUGH reported $79,745 of expenses for "Outside Services." Of that amount, $64,325 was purportedly paid to **BROWN**'s company GBJ Consulting, including $62,100 in Healthy Holly checks made payable to **BROWN**.

6.    PUGH caused Healthy Holly to file with the IRS a 2016 IRS Form 1099 to report $64,325 in payments that year to **BROWN**'s company, GBJ Consulting.

7.    For tax year 2016, **BROWN** filed a Schedule C for GBJ Consulting to report $64,325 in gross receipts for services purportedly provided to Healthy Holly.

8.     Under Maryland law, the maximum contribution that any one person or entity can contribute to a single candidate in an election cycle is $6,000.  MD ELECTION LAW § 13-226(b)(1).  Furthermore, it is illegal to make a campaign contribution to a candidate in someone else's name, commonly referred to as a straw donation.  MD ELECTION LAW § 13-602(a)(5).

9.     On or about the following dates, PUGH issued Healthy Holly checks payable to **BROWN** for the purpose of funding straw donations to the Committee to Elect Catherine Pugh.

| DATE OF HEALTHY HOLLY CHECK | AMOUNT OF HEALTHY HOLLY CHECK |
|---|---|
| January 11, 2016 | $3,025 |
| January 13, 2016 | $6,000 |
| January 13, 2016 | $6,000 |
| February 29, 2016 | $7,500 |
| March 9, 2016 | $10,000 |
| April 11, 2016 | $9,800 |

10.     None of the foregoing checks issued to **BROWN** were deposited into a bank account.  Instead, **BROWN** went to the bank where Healthy Holly's account was located and cashed the checks at the teller's window.  **BROWN** then used the untraceable cash to fund money orders, debit cards and personal checks in the names of straw donors totaling approximately $35,800.  The straw donations purchased with the cash were then deposited into the bank account for the Committee to Elect Catherine Pugh.

11.     Beginning in or about September 2016, and despite state authorities questioning the source of the funds for the straw donations, PUGH and **BROWN** continued the cashing-out scheme to maintain the pretense of a legitimate business relationship between **BROWN** and Healthy Holly.  PUGH issued more Healthy Holly checks to **BROWN** who, in turn, created false

20

invoices to correspond to those payments. **BROWN** took the checks to the bank where Healthy Holly's account was located and cashed the checks at the teller's window. **BROWN** gave the untraceable cash to PUGH. In total, **BROWN** and PUGH cashed out approximately $62,100 of Healthy Holly checks, all of which went to PUGH or straw donors.

12.     On or about January 11, 2017, **BROWN** was charged with, and ultimately convicted of, violating Maryland's election laws for funneling $18,000 of the above-described straw donations to PUGH's campaign. After **BROWN** was charged, the Committee to Elect Catherine Pugh issued five checks in the names of three of the straw donors. The memo line on each of the checks stated "returned contribution." However, none of the persons in whose names the donations had been made received any of the returned money. Instead, PUGH instructed **BROWN** to use the money to pay for his legal defense in the pending state election-law prosecution, a case that had legal implications for PUGH. Pursuant to PUGH's request, **BROWN** arranged to have the five checks cashed, then used the money to fund multiple payments to his attorneys totaling approximately $18,000. BROWN did not cooperate with investigative authorities in the state prosecution, and state authorities were unable to identify Healthy Holly as the source of the funds for the straw donations.

### The Conspiracy Charge

13.     From in or about December 2015 through in or about October 2018, in the District of Maryland and elsewhere, the defendant,

### GARY BROWN, JR.,

did knowingly and willfully conspire, combine, confederate, and agree with PUGH to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment, and collection of income taxes.

21

## The Purpose of the Conspiracy

14.     The purpose of the conspiracy to defraud the United States was to evade the assessment of taxes for income generated from the sale of Healthy Holly books and to financially enrich PUGH and **BROWN**.

## Manner and Means of the Conspiracy

It was part of the conspiracy to defraud that:

15.     PUGH and **BROWN** created the pretense of an ongoing business relationship between Healthy Holly and GBJ Consulting in order to conceal from the IRS the fact that PUGH created false business expenses to offset the income she received from the sale of books;

16.     PUGH issued Healthy Holly checks to **BROWN** even though neither **BROWN** nor GBJ Consulting provided any services or products to Healthy Holly;

17.     **BROWN** converted the Healthy Holly checks into cash to make the funds untraceable;

18.     PUGH and **BROWN** coordinated the expenditure of the Healthy Holly funds on matters unrelated to any legitimate business endeavors between GBJ Consulting and Healthy Holly, including paying for fraudulent campaign donations;

19.     To support the pretense of the deductibility of the checks as business expenses, **BROWN**, at PUGH's request, created a fake GBJ Consulting billing statement and backdated invoices;

20.     PUGH and **BROWN** told an accountant hired to prepare PUGH's 2016 income tax return that the checks written to **BROWN** from the Healthy Holly bank account were payments for services provided by GBJ Consulting to Healthy Holly;

21.     To further support the pretense of the deductibility of the checks as business expenses, PUGH caused the issuance of a 2016 IRS Form 1099 - Miscellaneous Income, to falsely

report to the IRS payments made to GBJ Consulting for services related to Healthy Holly's publishing business;

22.    PUGH filed a U.S. Individual Income Tax Return, Form 1040, for tax year 2016, including a Schedule C for Healthy Holly, LLC, that falsely reported the Healthy Holly payments to GBJ Consulting as expenses for "Outside Services," which substantially reduced the income tax due and owing by PUGH;

23.    To bolster PUGH's fraudulent deduction of Healthy Holly business expenses for "Outside Services" on her 2016 income tax return, **BROWN** filed a U.S. Individual Income Tax Return, Form 1040, for tax year 2016, including a Schedule C for GBJ Consulting, that falsely reported the Healthy Holly payments as business income;

24.    To avoid paying income taxes on the fictitious business income that **BROWN** claimed GBJ Consulting received from Healthy Holly, **BROWN** deducted fictitious business expenses on GBJ Consulting's 2016 Schedule C in an amount that exceeded the falsely reported business income, thereby creating a nontaxable, net business loss; and

25.    To substantiate the deduction of the fictitious GBJ Consulting business expenses that **BROWN** claimed on his 2016 income tax return, **BROWN** issued fraudulent Form 1099s in the names of various individuals who had never worked for **BROWN's** company.

### Acts in Furtherance of the Conspiracy

In furtherance of the conspiracy, and to effect the objects thereof, the following overt acts were committed in the District of Maryland, and elsewhere:

26.    On or about the dates set forth below, PUGH deposited into Healthy Holly's bank account the following checks payable to Healthy Holly for the purported sale of children's books:

| DATE OF DEPOSIT | AMOUNT OF CHECK |
| --- | --- |
| February 1, 2016 | $25,000 |
| March 9, 2016 | $50,000 |
| September 19, 2016 | $25,000 |
| October 17, 2016 | $100,000 |
| November 9, 2016 | $100,000 |
| December 28, 2016 | $45,000 |

27. On or about the dates set forth in paragraph 9, among others, PUGH issued checks to **BROWN** from the Healthy Holly bank account.

28. On or about the dates set forth in paragraph 9, among others, **BROWN** cashed Healthy Holly checks made payable to him.

29. In or about September 2016, PUGH and **BROWN** advised PUGH's tax preparer that the Healthy Holly checks issued to **BROWN** related to work provided by **BROWN's** company, GBJ Consulting.

30. In or about February 2017, PUGH issued and caused to be issued to **BROWN** an IRS Form-MISC 1099 to report $64,325 of Healthy Holly payments to GBJ Consulting. The form was sent to the IRS and **BROWN**.

31. On or about March 1, 2017, **BROWN** filed a 2016 Income Tax Return Form 1040, Schedule C that reported gross receipts for GBJ Consulting of $64,325 and total expenses of $68,160, resulting in a loss of $3,835.

32.     On or about March 19, 2018, PUGH filed a 2016 Income Tax Return Form 1040, Schedule C that reported total expenses of $79,745 for "Outside Services," of which $64,325 was paid to GBJ Consulting.

18 U.S.C. § 371

## COUNT THREE

### (Conspiracy with WEDINGTON to Defraud the United States)

The United States Attorney for the District of Maryland further charges that:

1.     Paragraphs 8 through 10, 12, and 14 of Count One are realleged and incorporated by reference as though fully set forth in this Count.

2.     From 2009 through 2019, Roslyn WEDINGTON ("WEDINGTON") was a full-time salaried employee of the Maryland Center for Adult Training, Inc., (hereinafter "MCAT"). At no time during that period was WEDINGTON an independent contractor.

3.     In 2015, **BROWN** became the chairperson of MCAT's Board and obtained signatory authority on MCAT's bank account.

4.     MCAT was located at 4910 Park Heights Avenue, Baltimore, Maryland.  MCAT was a non-profit 501(c)(3) entity that provided training and employment certifications for jobs in the healthcare field, including certifications to be a nursing assistant or a geriatric nursing assistant. MCAT represented itself to be a private career school accredited by the Maryland Higher Education Commission and the Maryland Board of Nursing.   MCAT was an approved "Eligible Training Provider" (hereafter "ETP") and its name appeared on the Maryland Department of Labor, Licensing and Regulation's ("DLLR") Eligible Training Provider list.

5.     As a recognized ETP, MCAT was eligible to receive, and did receive, federal funds, including U.S. Department of Labor Workforce Innovation and Opportunity Act ("WIOA") funds awarded through DLLR and the U.S. Department of Health and Human Services Temporary Assistance for Needy Family ("TANF") grant funds awarded by the State of Maryland's Department of Human Services.   MCAT has also received funding from private philanthropic organizations, such as the Abell Foundation and Associated Black Charities.

6.    In 2009, WEDINGTON was initially hired by MCAT to serve as its student coordinator. In 2012, WEDINGTON became the organization's executive director.

7.    During WEDINGTON's tenure at MCAT, **BROWN** uploaded information, supplied by WEDINGTON, to MCAT's payroll service provider's electronic platform.

8.    As executive director, WEDINGTON handled the day-to-day operations of MCAT, including, for example, what grants to pursue and what activities to undertake. WEDINGTON also handled the organization's day-to-day accounting.

9.    In 2011 and 2012, MCAT withheld funds from WEDINGTON's bi-weekly paycheck for the purposes of paying state and federal taxes and making contributions to the Social Security and Medicare programs. At the end of both of those years, WEDINGTON received an IRS Form W-2, which detailed MCAT's payroll withholdings.

10.    In 2013, WEDINGTON's salary was garnished in order to repay outstanding student loan debt and medical bills. In order to avoid further garnishments, WEDINGTON asked **BROWN** to take WEDINGTON "off payroll," as more fully described below, which **BROWN** agreed to do.

### The Conspiracy Charge

11.    From in or about November 2013 until in or about 2018, in the District of Maryland and elsewhere, the defendant,

### GARY BROWN, JR.,

did knowingly and willfully conspire, combine, confederate, and agree with WEDINGTON to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment, and collection of income taxes.

### The Purpose of the Conspiracy

The purpose of the conspiracy to defraud the United States was to evade the assessment of income taxes for income generated by WEDINGTON's employment with MCAT and to financially enrich WEDINGTON.

### Manner and Means of the Conspiracy

It was part of the conspiracy to defraud that:

12. Beginning in or about 2013, **BROWN** stopped submitting payroll information concerning WEDINGTON to MCAT's payroll provider, thereby avoiding an electronic funds transfer to WEDINGTON's bank account and the withholding of state and federal taxes and contributions to the Social Security and Medicare programs.   Instead, **BROWN** directed MCAT's payroll provider to pay him, **BROWN**, as an independent contractor.   **BROWN** in turn, provided the money to WEDINGTON in cash.

13. After September 2015, **BROWN** obtained signatory authority over MCAT's bank account and began issuing checks to WEDINGTON, which she, in turn, cashed.   In so doing, WEDINGTON avoided having her MCAT salary go through her bank account, where it could be garnished, and also avoided having any funds withheld for tax purposes.

14. Starting in 2013, **BROWN** also began preparing WEDINGTON's taxes on IRS Form 1040s, something he did each successive year through tax year 2017, in exchange for a small fee.

15. WEDINGTON knowingly filed false tax returns in 2013, 2014, 2015, 2016 and 2017, all of which had been prepared by **BROWN**, and all of which contained a written declaration that they were made under penalties of perjury.

16. Based on the salary WEDINGTON actually received from MCAT, WEDINGTON owed the following taxes in the following years:

28

| YEAR | SALARY | TOTAL TAX |
|------|--------|-----------|
| 2013 | $80,600.00 | $24,011.93 |
| 2014 | $80,600.00 | $23,889.08 |
| 2015 | $80,600.00 | $23,780.53 |
| 2016 | $84,200.00 | $25,177.53 |
| 2017 | $83,200.00 | $24,733.43 |
| **TOTAL** | | **$121,592.50** |

## Acts in Furtherance of the Conspiracy

In furtherance of the conspiracy, and to effect the objects thereof, the following overt acts were committed in the District of Maryland, and elsewhere:

**A.    Tax Year 2013**

17.     On April 20, 2014, WEDINGTON filed a Form 1040 for tax year 2013.    In her Form 1040, she falsely claimed to be unemployed.    WEDINGTON's only reported income for that year was $15,803 in unemployment insurance payments and $1,565 in state and local income tax refunds.    WEDINGTON did not report any income, of any kind, from MCAT.

18.    .    However, WEDINGTON did, in fact, receive a salary of $80,600 from MCAT for working 40 hours per week as the organization's executive director in 2013.    This salary was paid to her by **BROWN** in cash.    **BROWN** received the funds he paid WEDINGTON from MCAT.

19.     In 2013, MCAT did not issue a Form W-2 for WEDINGTON for her compensation of $80,600 as it had done in 2011 and 2012.    MCAT did not withhold any funds from WEDINGTON's salary in 2013.

20.     As a result of various false entries on her Form 1040 for 2013, WEDINGTON received a refund in the amount of $6,091 to which she was not entitled.

**B.    Tax Year 2014**

21.     On or about February 10, 2015, WEDINGTON filed a Form 1040 for tax year 2014. WEDINGTON did not report any income from MCAT during that year.

22. However, WEDINGTON did, in fact, receive a salary of $80,600 from MCAT for working 40 hours per week as the organization's executive director. **BROWN** paid this salary to WEDINGTON in cash. **BROWN** received the funds he paid WEDINGTON from MCAT.

23. In 2014, MCAT did not issue a Form W-2 for WEDINGTON for her compensation of $80,600. MCAT did not withhold any funds from WEDINGTON's salary in 2014.

24. The only income WEDINGTON reported on her 1040 for 2014 was $50,000 in gross receipts to RRW Consulting LLC, a company WEDINGTON organized that she described on a Schedule C as being in the business of "Management Consulting." This entry was false because RRW Consulting did not engage business activity in 2014. WEDINGTON also claimed $32,283 in false business expenses for RRW Consulting, which reduced her taxable income. As a result of various false entries on her Form 1040 for 2014, WEDINGTON received a refund in the amount of $4,957 to which she was not entitled.

**C. Tax Year 2015**

25. On or about February 8, 2016, WEDINGTON filed a Form 1040 for tax year 2015. Like 2014, WEDINGTON did not report any income from MCAT.

26. However, WEDINGTON did, in fact, receive a salary of $80,600 from MCAT for working 40 hours per week as the organization's executive director. **BROWN** paid this salary to WEDINGTON in cash until September 2015. **BROWN** received the funds he paid WEDINGTON from MCAT.

27. Beginning in or about September 2015, **BROWN** obtained signatory authority over MCAT's bank account. After that date, **BROWN** began issuing MCAT checks to WEDINGTON. WEDINGTON cashed those checks, rather than deposit them into a bank account. **BROWN** also told MCAT's payroll provider to make direct-deposit payments purportedly due to him, **BROWN**, into an account in the name of WEDINGTON's adult son, R.H.,

totaling $23,410, in 2015. WEDINGTON paid various personal expenses from this account. WEDINGTON opened an M&T Bank account in her son's name in September of 2013, after she closed her last known bank account in August 2013.

28.    MCAT did not issue a Form W-2 for WEDINGTON for her compensation of $80,600. MCAT did not withhold any funds from WEDINGTON's salary in 2015.

29.    The only income WEDINGTON reported in 2015 was $27,000 in gross receipts to RRW Consulting LLC on a Schedule C to her Form 1040. This entry was false because RRW Consulting did not engage in business activity in 2015. WEDINGTON also claimed $16,872 in false business expenses for RRW Consulting, which reduced her taxable income. As a result of various false entries on her Form 1040 for 2015, WEDINGTON received a refund in the amount of $3,774 to which she was not entitled.

30.    In June of 2015, DLLR performed a routine fiscal audit of MCAT because MCAT had received a grant from DLLR. As part of the audit procedures, DLLR reviewed various MCAT documents for the period of January 1, 2014 through May 31, 2015. In performing the audit, DLLR asked MCAT to provide documentation to support MCAT's expenditures of funds for that audit period. Specifically, DLLR requested documentation to support the expenditure of $185,330 to pay for 74 hours of work purportedly performed by **BROWN** as a "contractor" hired by MCAT. The amount paid to **BROWN** equated to a rate of $2,500 per hour. In addition, there was an additional $19,850 paid to **BROWN** during the audit period that also lacked supporting documentation. The amounts MCAT had paid **BROWN** during the audit period included WEDINGTON's salary. In order to conceal their scheme, WEDINGTON and **BROWN** did not disclose that fact to DLLR.

31

**D.     Tax Year 2016**

31.     On February 23, 2017, WEDINGTON filed a Form 1040 for tax year 2016.     Like in 2013, 2014 and 2015, WEDINGTON did not report any income from MCAT.

32.     WEDINGTON did, in fact, receive a salary of $84,200 from MCAT for working 40 hours per week as the organization's executive director.     WEDINGTON's salary was paid, via checks signed by **BROWN** and drawn on MCAT's account.     WEDINGTON cashed these checks.

33.     The only income WEDINGTON reported in 2016 was $27,000 in gross receipts to RRW Consulting LLC, on a Schedule C to her Form 1040.     This entry was false because RRW Consulting did not engage in business activity in 2016.     WEDINGTON also claimed $16,471 in false business expenses for RRW Consulting, which reduced her taxable income.     As a result of various false entries on her Form 1040, WEDINGTON improperly received a refund in the amount of $3,425 to which she was not entitled.

34.     In 2016, WEDINGTON filed a workers compensation claim against MCAT for an injury suffered while at work.     As part of the claims process, The Hartford, the insurance carrier for MCAT, required that a "Statement of Wage Information" be submitted by MCAT.     In the Statement of Wage Information prepared by WEDINGTON and **BROWN**, and submitted to The Hartford by MCAT, WEDINGTON and **BROWN** represented WEDINGTON's weekly gross salary as $1,600, reduced to $1,181 purporting to show the deduction of employment taxes.     As a result of the workers compensation claim, WEDINGTON received a settlement in the amount of $8,942.

**E.     Tax Year 2017**

35.     On or about February 7, 2018, WEDINGTON filed a Form 1040 for tax year 2017. WEDINGTON reported no wages or income of any kind.

36.     WEDINGTON did, in fact, receive a salary of $83,200 from MCAT for working 40 hours per week as the organization's executive director in 2017.   WEDINGTON's salary was paid via checks signed by **BROWN** and drawn on MCAT's account.   WEDINGTON cashed these checks.

37.     Unlike 2014, 2015, and 2016, WEDINGTON reported no gross receipts on her Form 1040, Schedule C, for RRW Consulting LLC.   However, WEDINGTON did claim expenses of $12,529 for RRW Consulting, generating a loss of $12,529.   RRW Consulting did not incur these expenses in 2016.   As a result of various false entries on her Form 1040 for 2017, WEDINGTON received a refund in the amount of $2,757 to which she was not entitled.

18 U.S.C. § 371

## COUNT FOUR

### (Filing a False Return)

The United States Attorney for the District of Maryland further charges that:

1.      Paragraphs 8 through 14 of Count One are realleged and incorporated by reference as though fully set forth in this Count.

2.      On or about March 27, 2017, in the District of Maryland and elsewhere, the defendant,

### GARY BROWN, JR.,

did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, and accompanying schedules for the calendar year 2016, which was verified by a written declaration that it was made under the penalties of perjury and which **BROWN** did not believe to be true and correct as to every material matter.   Specifically, **BROWN** there and then well knew that the income tax return was false in that the amounts as listed in the chart below were substantially different from the correct amounts.

| Line on Tax Return | Amount Listed |
|---|---|
| Schedule C, Line 1<br>(Gross Receipts for GBJ Consulting, LLC) | $64,325 |
| Schedule C, Line 28<br>(Expenses for  GBJ Consulting, LLC) | $68,160 |
| Form 1040, Line 22 (Total Income) | $8,153 |

26 U.S.C. § 7206(1)

# FORFEITURE ALLEGATIONS

The Grand Jury for the District of Maryland further finds that:

1.    The allegations contained in Count One of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.    Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence.

3.    Upon conviction of the offense in violation of Title 18, United States Code, Section 1349 set forth in Count One of this Indictment, the defendant,

## GARY BROWN, JR.,

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.   The property to be forfeited includes, but is not limited to, the following:

a.    A sum of money equal to the value of the property obtained by the scheme to defraud, which amount is at least $853,680.

4.    If any of the property described above, as a result of any act or omission of the defendants:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), up to the value of the forfeitable property described above.

18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853

Date: _November 6, 2019_

Robert K. Hur
United States Attorney for the
District of Maryland