## Attachment A - Stipulation of Facts

The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.

From approximately September 2011 until December 2016, the defendant, Gary Brown, Jr. ("BROWN"), worked as a legislative aide to Catherine Elizabeth Pugh ("PUGH"), a senator in the Maryland State Senate. BROWN actively campaigned for PUGH's reelection to the State Senate in 2014.

BROWN served as PUGH's campaign aide during her 2016 mayoral election campaign. Following PUGH's election and inauguration as mayor of Baltimore City in December 2016, BROWN was hired as the Deputy Director of Special Events in the mayor's office. BROWN and PUGH had offices on the same floor in City Hall. In December 2016, the Maryland Democratic Central Committee nominated BROWN to fill a vacancy in the Maryland House of Delegates created by PUGH's mayoral victory. However, BROWN never served in that position because the governor withdrew his nomination after he was indicted for election law violations in January 2017.

BROWN was the sole owner and operator of Stricker Abstracting, LLC, and GB Abstracting, LLC, both Maryland companies that purported to be title-abstracting businesses, and GBJ Consulting, LLC, a Maryland consulting business. BROWN ran all three companies from his residences in Baltimore. BROWN also freelanced as a tax return preparer.

Beginning in or about March 2011, BROWN started to help PUGH manage her book publishing business. PUGH was the sole owner of Healthy Holly, LLC ("Healthy Holly"), a company formed in Maryland on January 14, 2011. PUGH used the company to publish and sell children's books that she had written. Healthy Holly's principal business address was PUGH's residence in Baltimore, Maryland. PUGH was the sole signatory on both Healthy Holly's bank account ending in 8269 and the Pugh Company's bank account ending in 1653.

On or about the following dates, Healthy Holly published four illustrated children's books: (1) June 21, 2011, *Healthy Holly: Exercising is Fun* (Book One); (2) March 8, 2013, *Healthy Holly: A Healthy Start for Herbie* (Book Two); (3) August 25, 2015, *Healthy Holly: Fruits Come in Colors Like the Rainbow* (Book Three); and (4) August 18, 2017, *Healthy Holly: Vegetables*

1

*are not just* (sic) *Green* (Book Four). PUGH was the author of all four books. The Healthy Holly book series was not sold primarily through retail or wholesale vendors. Instead, BROWN and PUGH marketed and sold the books directly to non-profit organizations and foundations, many of which did business or attempted to do business with Maryland state government and Baltimore City.

Between approximately March 2011 until March 2019, BROWN helped PUGH promote and sell the Healthy Holly books. While PUGH paid an illustrator and a graphic artist to help publish her books, PUGH and BROWN were the only people who organized the sale and distribution of the books. As the company's Chief Operating Officer ("COO"), BROWN oversaw the transportation and storage of the books, drafted invoices, and corresponded with purchasers. Much of Brown's work on behalf of Healthy Holly occurred during work hours while serving as PUGH's legislative aide and mayoral staff member. BROWN was not an employee of Healthy Holly and received no salary or compensation until approximately mid 2016 when he started to get sales commissions. None of his companies received compensation for services purportedly provided to Healthy Holly.

## I.     Count One - The Scheme to Defraud Book Purchasers

From in or about November 2011 until in or about March 2019, BROWN and PUGH participated in a scheme to fraudulently sell and distribute tens of thousands of Healthy Holly books. Over that period, they executed the scheme in three ways. First, PUGH and BROWN promised a certain number of books at a given price, then kept the money and did not provide the books as promised. Second, they provided books to purchasers, but later converted them to their own use at campaign events and government functions. Third, they resold books that had been previously purchased and donated to the Baltimore City Public Schools.

### A.     The Fraudulent Conversion of Books Sold to the University of Maryland Medical System

#### 1.     The Printing and Sale of Book One

In or about December 2010, PUGH negotiated the sale of 20,000 Healthy Holly books for $100,000 to the University of Maryland Medical System ("UMMS"), a nonprofit healthcare organization based in Maryland. The book was titled *Healthy Holly: Exercising is Fun* ("Book One"). At PUGH's suggestion, UMMS agreed to buy Book One on the condition that the purchase be on behalf of, and for distribution to, school children in the Baltimore City Public Schools system

("BCPS"). The purchase was also contingent on PUGH delivering the donated books to the school system. UMMS decided to purchase the book, in part, to further the mission of its community outreach program.

In or about January 2011, PUGH approached the Chief Executive Officer for BCPS about accepting the donation of Book One from UMMS. The CEO agreed to accept the books, but first had members of his staff copy-edit the book. They identified various grammatical and spelling errors for PUGH to correct. Ultimately, the CEO decided not to include the book in BCPS's curriculum; instead, he authorized giving a copy of the book to all age-appropriate students for them to take home. PUGH helped arrange a letter of agreement between UMMS and the school system regarding the purchase and donation of Book One.

On or about February 17, 2011 and May 20, 2011, PUGH accepted two $50,000 checks from UMMS for the sale of Book One. The checks were deposited into a bank account. On or about May 10, 2011, BROWN sent an email to UMMS stating, "please find attached the corrected invoice." On or about March 2, 2011 and June 2, 2011, PUGH paid a printing company a total of $13,480 to print and deliver 22,110 copies of Book One, which was the only edition of Book One ever printed.

PUGH made arrangements to have approximately 20,020 copies of the books delivered to the headquarters for BCPS located at 200 E. North Ave., Baltimore, MD, and another 2,090 copies of the books delivered to "Senator Catherine E. Pugh" at her legislative office located at 2901 Druid Park Drive, Suite 200C, Baltimore, MD. On or about June 6, 2011, the 20,020 copies of Book One were delivered to the mail room at 200 E. North Avenue, Baltimore, MD. Pending a determination about how best to deliver the books to the students, BCPS employees moved the books to a warehouse used by the school system, which was located at 5300 Pulaski Highway, Baltimore, MD ("City Warehouse").

Beginning in or about October 2011, PUGH and BROWN arranged for thousands of copies of Book One to be removed from the City Warehouse for PUGH's personal use and benefit. Sometimes BROWN enlisted the help of other City employees to remove and transport the books. On other occasions, PUGH paid associates of BROWN to remove and transport the books. PUGH and BROWN arranged for the books to be delivered and stored at various locations in Baltimore City, including her residence in Baltimore City; her state legislative offices in Annapolis and Baltimore City; her mayoral office at City Hall; at BROWN's office in City Hall; the War

Memorial building in Baltimore City; PUGH's campaign office on N. Charles Street in Baltimore; a public storage locker used by the mayoral campaign; PUGH's personal and governmental vehicles; and vehicles belonging to BROWN and other members of PUGH's staff. PUGH routinely used the cached copies as giveaways at various events in order to promote Book One and her political campaigns. BROWN oversaw the logistics of storing, accessing, transporting, and delivering the books. Neither UMMS nor BCPS authorized PUGH's conversion of Book One to her own use.

### 2. The Fraudulent Delivery of Book Two to PUGH's Legislative Office

On or about August 22, 2012, PUGH negotiated the sale of 20,000 more Healthy Holly books to UMMS for $100,000. The title of the second book was *Healthy Holly: A Healthy Start for Herbie* ("Book Two"). As with the first purchase, UMMS agreed to buy Book Two on behalf of, and for distribution to, school children in the Baltimore City Public Schools system. The purchase of Book Two was also contingent on PUGH delivering the donated books to the school system for distribution to the students. During discussions with UMMS about the sale of Book Two, PUGH failed to disclose the fact that Book One had not been distributed to BCPS students in accordance with the terms of its purchase.

In or about August of 2012, the CEO for BCPS agreed to accept UMMS's donation of 20,000 copies of Book Two. The CEO had members of his staff copy-edit the book to correct various grammatical and spelling errors. The CEO decided to give a copy of the non-instructional book to all age-appropriate students for them to take home. PUGH helped arrange a letter of agreement between UMMS and BCPS regarding the donation of Book Two.

On or about August 22, 2012, BROWN drafted and sent an invoice to UMMS. On or about November 6, 2012, UMMS gave PUGH a $100,000 check payable to Healthy Holly for the purchase of 20,000 copies of Book Two. PUGH deposited the check into Healthy Holly's bank account on November 19, 2012.

On or about December 12, 2012, PUGH sent an email from cepughco@aol.com with instructions to the publisher about how to split up the order, stating, "Let's make that 18500 [for the] schools and 1500 [for] Me."

On or about December 19, 2012 and March 20, 2013, PUGH issued two Healthy Holly checks to a printing company totaling $14,325 to print and deliver 20,100 copies of Book Two, which was the only edition of Book Two ever printed. PUGH made arrangements to have 18,600

copies of the books delivered BCPS headquarters at 200 E. North Ave., Baltimore, MD, and another 1,500 of the books delivered to "Senator Catherine E. Pugh" at her legislative office located at 2901 Druid Park Drive, Suite 200C, Baltimore, MD. The books were distributed to the respective locations on or about March 19 and 28, 2013. The books delivered to BCPS were stored at the City Warehouse.

UMMS had no knowledge that PUGH had delivered 1,400 of its copies of Book Two to her legislative office instead of giving them to the school system. In so doing, PUGH unlawfully converted 1,400 copies to her own personal use without the consent of UMMS or BCPS. The fraudulent conversion provided PUGH with a free inventory of books that she used as giveaways at various events in order to promote Book Two and her political campaigns.

### 3. The Fraudulent Delivery of Book Three to PUGH's Legislative Office

On or about January 24, 2015, PUGH negotiated the sale of 20,000 more Healthy Holly books to UMMS for $100,000. The title of the third book was *Healthy Holly: Fruits Come in Colors Like the Rainbow* ("Book Three"). As with the first two purchases, UMMS agreed to buy Book Three on behalf of, and for distribution to, school children in the Baltimore City Public Schools system, and PUGH agreed to deliver them. During discussions with UMMS about the sale of Book Three, PUGH failed to disclose the fact that Books One and Two were not distributed to BCPS students in accordance with the terms of those purchases.

On or about January 26, 2015, BROWN sent an email with an attached invoice to UMMS noting that the invoice was "for the purchase of [Book Three] for the Baltimore City Public School System." On or about March 18, 2015, UMMS gave PUGH a $100,000 check payable to Healthy Holly for the purchase of Book Three. PUGH deposited the check into Healthy Holly's bank account on April 23, 2015.

On or about June 5, 2015 and October 2, 2015, PUGH paid a printing company a total of $15,275 to print and deliver 21,000 copies of Book Three, which was the only edition of Book Three ever printed. PUGH and BROWN made arrangements to have 19,500 copies of the books delivered to BCPS headquarters at 200 E. North Ave., Baltimore, MD, and another 1,500 copies of the books delivered to "Senator Catherine E. Pugh" at her legislative office located at 2901 Druid Park Drive, Suite 200C, Baltimore, MD. The books were distributed to the respective locations on or about August 25, 2015. The books delivered to BCPS were stored at the City Warehouse.

UMMS had no knowledge that PUGH had delivered 500 copies of its Book Three to her legislative office instead of giving them to the school system. In so doing, PUGH unlawfully converted 500 copies of Book Three to her own personal use without the consent of UMMS or BCPS. The fraudulent conversion provided PUGH with a free inventory of books that she used as giveaways at various events to promote Book Three and her mayoral campaign.

**B.** **The Fraudulent Resale of Books One, Two, and Three to Other Purchasers**

Beginning in or about October 2011, PUGH began selling to unwitting purchasers copies of Healthy Holly Books One, Two and Three, which had already been sold to UMMS and donated to BCPS. To that end, PUGH used Associated Black Charities, a Baltimore-based public charity ("Charity"), to facilitate the resale and distribution of the books to new purchasers. The new purchasers entered into an agreement with PUGH whereby they agreed to buy Healthy Holly books through the Charity to support a worthy cause. Neither the Charity nor the new purchasers knew that PUGH was double selling the books.

Pursuant to the Charity's agreement with PUGH, the Charity kept a percentage of the purchase price paid by the new purchasers, and forwarded the balance to PUGH. PUGH then had copies of the books delivered to the Charity, which, in turn, agreed to deliver the books to a worthwhile children's program on behalf of the new purchasers. BROWN facilitated the delivery of the books from either the City Warehouse or PUGH's legislative offices.

**1.** **The Resale of Book One to CareFirst**

On or about October 7, 2011, PUGH discussed the sale of Healthy Holly books with CareFirst, a nonprofit healthcare insurer based in the Baltimore-Washington DC area. As part of its community outreach program, CareFirst agreed to buy the books through the Charity for $7,000. On or about October 24, 2011, CareFirst sent the Charity a check for $7,000. The Charity retained $1,000 of the payment and forwarded $6,000 to PUGH, which PUGH used to pay down a home equity line of credit. To fill the book order, on or about November 27, 2011, PUGH took 1,000 copies of Book One from the shipment of books that UMMS had purchased and donated to the school system in June 2011. Neither UMMS nor BCPS authorized the fraudulent resale of those books to Carefirst. BROWN delivered the 1,000 copies of Book One to the Charity, which, in turn, delivered them to daycare centers.

On or about November 10, 2016, BROWN emailed CareFirst to solicit the purchase of "an additional 1000 Healthy Holly Books." CareFirst responded by asking BROWN to contact the Charity about submitting a formal request through its online application system and noting that it was "late in the year . . . [and] it may not be able to accommodate 1,000 books."

On or about April 5, 2017, BROWN emailed the Charity to determine if it had contacted CareFirst about buying additional books. The Charity advised BROWN that it was "no longer going to be in this 'lane' . . . to avoid potential conflicts."

### 2. The Resale of Book Two to the Maryland Automobile Insurance Fund

On or about August 27, 2013, PUGH called the President and CEO of the Charity to say that three organizations had agreed to purchase copies of PUGH's "second children's book." PUGH told the Charity that CareFirst had agreed to buy 1,000 copies; the Maryland Automobile Insurance Fund ("MAIF") had agreed to buy 1,000 copies; and a Chicago investment firm had agreed to purchase 400 copies.

On or about August 29, 2013, PUGH texted the Charity's CEO to confirm that MAIF would be sending a check to the Charity to buy "one thousans [sic] books." PUGH also confirmed that the Charity would "deduct $1,000" from the payment for itself and the balance would be given to PUGH via a check payable to Healthy Holly, which she would "pick up." Ultimately, MAIF paid the Charity $5,000 as a "charitable donation" for the purchase of only 556 copies of Book Two. The Charity kept $552 of the payment and gave PUGH the balance via a check for $4,448 payable to Healthy Holly, which PUGH deposited into Healthy Holly's bank account on October 4, 2013.

PUGH advised the Charity that she would deliver MAIF's books to daycare centers instead of having the Charity do it. However, the only source of 1,000 copies of Book Two to fill that order was the shipment of Book Two that UMMS had purchased and donated to the school system in March 2013. Neither UMMS nor BCPS authorized the fraudulent resale of those books to MAIF.

### 3. The Resale of Books One and Two to Ariel Investments

On or about August 6, 2013, a member of PUGH's legislative staff helped coordinate the sale of 400 Healthy Holly books to Ariel Investments ("Ariel"), a Chicago-based investment firm. Ariel was a co-sponsor of the 2013 Black Corporate Director's Conference held on September 6-8, 2013, in Laguna Beach, CA. Ariel wanted to include a copy of the books in its "swag" gift bag

to be handed out to conference attendees. PUGH told Ariel to order the books through the Charity's CEO.

On or about August 12, 2013, PUGH arranged for the delivery of 400 Healthy Books to Ariel, which included 200 copies of Book One and 200 copies of Book Two. A member of PUGH's legislative staff sent confirmation of the shipment to Ariel via email account "Catherine.Pugh@senate.state.md.us." A copy of each book, valued at $9 per book, was included in the gift bags that were handed out at the conference. The conference agenda listed "State Senator Catherine E. Pugh" as one of the panelists. The conference sponsors paid PUGH's travel and lodging expenses totaling approximately $4,664.

On or about September 12, 2013, PUGH sent a Healthy Holly invoice to Ariel seeking payment for the shipped copies of "Healthy Holly: Exercising is Fun!" and "Healthy Holly: A Healthy Start For Herbie." The invoice directed all inquiries to BROWN and requested that a check be made payable to "[the Charity] Attn: Healthy Holly." On or about September 26, 2013, a legislative staff member sent an email to Ariel stating, "Senator Pugh wanted to get an update for the payment that will be going to [the Charity] for the books." On or about October 4, 2013, Ariel sent a check to the Charity for $3,680. On or about October 17, 2013, the Charity forwarded the full amount to PUGH via a check payable to Healthy Holly, which PUGH deposited into the company's bank account on October 24, 2013.

To fill the book order for Ariel, PUGH took 200 copies of Book One from the shipment of books that UMMS had donated to the school system in June 2011, and 200 copies of Book Two from the shipment of books that UMMS had donated to the school system in March 2013. Neither UMMS nor BCPS authorized the fraudulent resale of the books to Ariel.

### 4.    The Resale of Book Two to CareFirst

On or about December 3, 2013, PUGH contacted CareFirst about purchasing 1,000 copies of Book Two through the Charity for $7,500. On or about February 12, 2014, CareFirst issued a $7,500 check to the Charity to buy the books. The Charity kept $1,000 of the payment, and forwarded the balance of $6,500 to PUGH via a check made payable to Healthy Holly, which PUGH deposited into the company's bank account on March 26, 2014. BROWN delivered the 1,000 copies of Book Two to the Charity, which, in turn, delivered most of them to youth-related organizations.

To fill CareFirst's book order, PUGH took 1,000 copies of Book Two from the shipment of books that UMMS had donated to the school system in March 2013. Neither UMMS nor BCPS authorized the fraudulent resale of those books to CareFirst.

### 5. The Resale of Book Three to a Maryland Trust Fund

On or about December 14, 2016, a trust fund based in Maryland (the "Fund") sent the Charity a check for $50,000, which the charity used to purchase 5,000 copies of Healthy Holly books. On or about December 22, 2016, BROWN emailed an invoice to the Charity requesting payment of $45,000 for an "assortment of books," which took into account the price of the books minus the Charity's fee of $5,000. In the email, BROWN stated that he could "come pick up the check when ready." On December 23, 2016, the charity sent PUGH a $45,000 check payable to Healthy Holly, which PUGH deposited into the company's bank account on December 28, 2016.

PUGH delivered 500 copies of Book Three to the Charity, which the Charity then distributed to an affiliate office for further distribution to youth-related groups. In reference to the other 4,500 books purchased with the Fund's donation, the Charity requested an explanation from PUGH about how the books were going to be distributed to insure that the Fund's donation would be tax deductible. On February 1, 2017, BROWN sent the Charity a letter claiming that "Healthy Holly LLC will be delivering 5000 [copies of] Healthy Holly: Fruit [sic] Come in the Colors Like the Rainbow [Book Three] to the Baltimore City Public Schools." The letter noted that the books would be delivered to the City Warehouse so the school system could "distribut[e] the books to their students."

To fill the book order, PUGH and BROWN converted 5,000 copies of Book Three from the shipment of books that UMMS had donated to the school system back in August 2015, books that had already been delivered to the City Warehouse. Neither UMMS nor BCPS authorized the fraudulent resale of those books.

### 6. The Resale of Books One, Two, and Three to the Kaiser Foundation

On or about December 17, 2015, PUGH discussed the sale of Healthy Holly Books with the Kaiser Foundation ("Kaiser"), a nonprofit healthcare foundation with offices in Maryland. Kaiser agreed to purchase the books as part of its community outreach program, which included giving away free literature at events that promoted healthy lifestyles. On or about December 22, 2015, BROWN emailed Kaiser a Healthy Holly invoice seeking $25,000 for 5,000 unspecified Healthy Holly books.

9

On January 8, 2016, BROWN sent Kaiser an email reminding the company of the outstanding balance due and stating, "I would like to set up the shipment of books." Kaiser sent PUGH a $25,000 check payable to Healthy Holly on January 21, 2016, which PUGH deposited into the company's bank account on February 1, 2016.

On or about June 27, 2016, BROWN emailed Kaiser another Healthy Holly invoice seeking $25,000 for 5,000 more unspecified Healthy Holly books. On or about September 1, 2016, BROWN sent an email requesting an "updated status" for the outstanding payment and asking "where will the books be going to." On or about September 13, 2016, Kaiser sent PUGH a $25,000 check payable to Healthy Holly, which PUGH deposited into the company's bank account on September 19, 2016.

To fill the foregoing book orders totaling 10,000 books, PUGH and BROWN took approximately 1,000 copies of Book One from the shipment of books that UMMS had donated to BCPS in June 2011; approximately 1,000 copies of Book Two from the shipment of books that UMMS had donated to BCPS in March 2013; and approximately 7,500 from the shipment of books that UMMS had donated to BCPS in August 2015. Neither UMMS nor the BCPS authorized the fraudulent resale of those books to Kaiser. BROWN delivered the books to Kaiser's offsite storage facility.

### C. False Promises to Induce Advance Payments for Books Never Delivered

#### 1. The Non-Delivery of Book Two to MAIF

In or about July 2012, PUGH negotiated the sale of 1,000 copies of Book Two to MAIF via the Charity for $7,500. On or about July 10, 2012, BROWN drafted the invoice for the books. On August 20, 2012, the Executive Director for MAIF sent an internal memo authorizing the purchase of the books via the Charity using funds from the company's charitable-distributions budget. However, on or about August 24, 2012, MAIF sent PUGH a $7,500 check made payable to Healthy Holly instead of the Charity. PUGH deposited the check into Healthy Holly's account on September 7, 2012. The Charity did not receive a percentage of the sale. In addition, neither the Charity nor MAIF ever received the 1,000 copies of Book Two for further distribution to a charitable cause.

#### 2. The Non-Delivery of Books Four and Five to Kaiser

On or about October 16, 2017, the Director of Community Health for Kaiser had a conversation with PUGH about obtaining copies of Book Four, titled *Healthy Holly: Vegetables*

*are not just* (sic) *Green*, to hand out at various community events. That same day, members of PUGH's mayoral staff sent an email to the Director discussing how the company could get copies of the book. The email also discussed Kaiser's request to have PUGH attend the company's upcoming community events to sign her books and to conduct a reading. On or about October 16, 2017, BROWN sent an email to Kaiser seeking a chance "to discuss the continuation of our partnership with the purchase of the upcoming Healthy Holly book."

On or about October 31, 2017, BROWN sent Kaiser an email with an attached invoice seeking payment of $14,000 for 2,000 copies of Book Four. On or about November 24, 2017, Kaiser sent PUGH a check for $14,000 made payable to Healthy Holly, which PUGH deposited into the Healthy Holly bank account on November 30, 2017. However, PUGH and BROWN never delivered the 2,000 copies of Book Four to Kaiser. In addition, one year later, on or about October 22, 2018, BROWN emailed a new invoice to Kaiser seeking $25,000 for an unpublished Healthy Holly book (Book Five) to be titled *Healthy Holly: Walking with My Family is Fun.* On or about November 20, 2018, not realizing that Book Four had not been delivered, Kaiser sent PUGH a $25,000 ACH payment to Healthy Holly's bank account to pay for 4,000 copies of Book Five. PUGH and BROWN never delivered copies of Book Five to Kaiser.

### 3. The Non-Delivery of Books Four and Five to UMMS

On or about October 17, 2016, PUGH negotiated the sale of 20,000 copies of Book Four to UMMS for $100,000. During discussions with UMMS about the sale of Book Four, PUGH failed to disclose the fact that the first three books were not distributed to BCPS students in accordance with the terms of those purchases. PUGH and BROWN never told UMMS about the fraudulent acquisition and use of those books over the preceding five years, including the diversion of the books to PUGH's legislative offices, the use of the books as promotional and political giveaways, and the resale of thousands of books to new purchasers for PUGH's own financial gain.

On or about October 17, 2016, BROWN emailed UMMS an invoice for 20,000 copies of Book Four on behalf of BCPS. On or about November 3, 2016, UMMS sent PUGH a check for $100,000 payable to Healthy Holly for the purchase and delivery of 20,000 copies of Book Four. PUGH deposited the check into Healthy Holly's bank account on November 9, 2016, part of which PUGH used to purchase a new house on December 13, 2016. As of April 2019, PUGH and BROWN never delivered the 20,000 copies of Book Four for which Healthy Holly had been paid.

On or about September 12, 2018, PUGH approached Purchaser A about buying 20,000 copies of a new Healthy Holly book (Book Five) for $100,000. During those discussions, PUGH failed to disclose the fact that the first four books were not distributed to BCPS students in accordance with the terms of those purchases. On or about October 12, 2018, BROWN emailed UMMS an invoice for 20,000 copies of Book Five. On or about November 14, 2018, UMMS sent PUGH a check for $100,000 payable to Healthy Holly for the purchase and delivery of 20,000 copies of Book Four on behalf of BCPS. On or about November 27, 2018, PUGH deposited the check into Healthy Holly's account. PUGH and BROWN never delivered the 20,000 copies of Book Five for which Healthy Holly had been paid.

## II.  Count Two – Conspiracy with PUGH to Defraud the United States

### A.  The Use of Healthy Holly Money to Fund Straw Donations

PUGH announced her intention to run for mayor of Baltimore in September 2015. As PUGH's campaign aide, BROWN helped organize events and track campaign donations to the Committee to Elect Catherine Pugh. In or about January 2016, PUGH and BROWN discussed the need to increase campaign donations before the regularly scheduled campaign finance reports became public. Believing that the mayoral candidate who raised the most money prior to the primary election on April 26, 2016 would have the best chance of winning the general election on November 8, 2016, PUGH and BROWN decided to inflate the amount of total contributions by secretly contributing PUGH's own money to the campaign. PUGH and BROWN further believed that if the voters learned that PUGH had injected her own money into the campaign, she would appear desperate and that would hurt her reelection chances.

To conceal the fact that PUGH was using her own money to boost her campaign finance reports, PUGH and BROWN decided to make contributions to her campaign in other people's names, *i.e.*, to use straw donors, which is a violation of Maryland's election laws. To further conceal the campaign finance scheme, PUGH decided to use money in Healthy Holly's business account to fund the straw donations, including money received from book sales. To that end, PUGH wrote checks payable to BROWN from that account. Instead of depositing the checks into a bank account, BROWN took the checks to the bank where Healthy Holly's account was located and cashed them at the teller's window, thereby acquiring untraceable cash to fund the straw donations. BROWN used the untraceable cash to fund money orders, debit cards and personal

checks in the names of straw donors. The straw donations funded through the cashing-out scheme were submitted to the Committee to Elect Catherine Pugh.

In furtherance of the scheme, PUGH issued the following checks to BROWN prior to the primary mayoral election:

| DATE OF HEALTHY HOLLY CHECK | AMOUNT OF HEALTHY HOLLY CHECK |
|---|---|
| January 11, 2016 | $3,025 |
| January 13, 2016 | $6,000 |
| January 13, 2016 | $6,000 |
| February 29, 2016 | $7,500 |
| March 9, 2016 | $10,000 |
| April 11, 2016 | $9,800 |

BROWN used most of the foregoing funds to make straw donations totaling approximately $35,800. The balance of the cash not used for straw donations was returned to PUGH. The straw donations were submitted in the names of BROWN's and PUGH'S family members, friends, and associates, including PUGH'S senatorial administrative assistant. Most of the straw donors allowed BROWN to use their names to make the illegal contributions and provided him with their bank account numbers.

**B. The Pretense of a Business Relationship between Healthy Holly and GBJ Consulting**

Beginning in or about September 2016, state authorities began to question the source of the funds for some of the straw donations. To backstop their scheme in case the authorities discovered that Healthy Holly was the funding source, PUGH continued to issue checks to BROWN throughout 2016 to create the pretense of a legitimate business relationship between BROWN and Healthy Holly. In addition, at PUGH's request, BROWN created a fake independent contractor agreement and business ledger that misrepresented the checks as payments for promotional services rendered by BROWN's company, GB Consulting, LLC, on behalf of Healthy Holly. Also at PUGH'S urging, BROWN created bogus GB Consulting invoices and backdated

them. BROWN continued cashing out the checks at the teller window at PUGH's bank, but, instead of funding more straw donations himself, he delivered the cash to PUGH. In total, BROWN and PUGH cashed out approximately $62,100 of Healthy Holly checks during 2016, all of which went to straw donors or to PUGH.

On or about January 11, 2017, BROWN was charged with, and ultimately convicted of, violating Maryland's election laws for funneling $18,000 of the above-described straw donations to PUGH's campaign. After the charges became public, the Committee to Elect Catherine Pugh issued five checks in the names of three of the straw donors. The memo line on each of the checks stated "returned contribution." However, none of the persons in whose names the donations had been made received any of the returned money. Instead, PUGH instructed BROWN to use the money to pay for his legal defense in the pending state election-law prosecution, a case that had legal implications for PUGH. PUGH picked the law firm that BROWN hired, assuring him that he would be okay because the attorney there would take care of him.

Pursuant to PUGH's request, BROWN arranged to have the five checks cashed, then used the money to fund multiple payments to his attorneys totaling approximately $18,000. BROWN did not cooperate with investigative authorities in the state prosecution, and state authorities were unable to identify Healthy Holly as the source of the funds for the straw donations.

## C. Backstopping the Fictitious Business Relationship to Evade Taxes

In addition to creating fake documents to backstop the fictitious business relationship between Healthy Holly and GBJ Consulting, PUGH and BROWN used the bogus relationship to defraud the IRS in 2016. More specifically, they coordinated the information contained in their respective companies' tax filings to falsely represent the Healthy Holly checks as deductible business expenses.

PUGH and BROWN told an accountant hired to prepare PUGH'S 2016 income tax return that the checks written to BROWN from the Healthy Holly bank account were payments for services provided by GBJ Consulting to Healthy Holly. As a result, PUGH's accountant issued an IRS Form 1099 – Miscellaneous Income to report $64,325 in payments to BROWN as expenses incurred during the ordinary course of Healthy Holly's publishing business. The form was sent to both the IRS and BROWN.

The false expense of $64,325 was also reported on PUGH's U.S. Individual Income Tax Return, Form 1040, for tax year 2016. Specifically, the expense was included on PUGH'S

Schedule C for Healthy Holly in the expense category for "outside services." Deducting the false expense substantially reduced the income tax due and owing by PUGH.

Consistent with PUGH's treatment of the false expense, BROWN filed a U.S. Individual Income Tax Return, Form 1040, for tax year 2016 that listed the $64,325 of Healthy Holly payments as business income on his Schedule C for GBJ Consulting. Reporting the fictitious income on his return meant that BROWN would have to pay income taxes on it. However, to avoid paying taxes, BROWN deducted fictitious business expenses on GBJ Consulting's 2016 Schedule C in an amount that exceeded the falsely reported business income, thereby creating a nontaxable, net business loss. The fictitious business expenses included fake labor expenses for nonexistent employees. To substantiate the deduction of those labor expenses, BROWN issued fraudulent Form 1099s in the names of various individuals who had never worked for GBJ Consulting.

## III.  Count Three - Conspiracy with WEDINGTON to Defraud the United States

### A.  The Maryland Center for Adult Training, Inc.

The Maryland Center for Adult Training, Inc. ("MCAT") was located at 4910 Park Heights Avenue, Baltimore, Maryland. MCAT was a non-profit 501(c)(3) entity that provided training and employment certifications for jobs in the healthcare field, including certifications to be a nursing assistant or a geriatric nursing assistant. MCAT represented itself to be a private career school accredited by the Maryland Higher Education Commission and the Maryland Board of Nursing. MCAT was an approved "Eligible Training Provider" (hereafter "ETP") and its name appeared on the Maryland Department of Labor, Licensing and Regulation's (DLLR) Eligible Training Provider list.

As a recognized ETP, MCAT was eligible to receive, and did receive, federal funds, including U.S. Department of Labor Workforce Innovation and Opportunity Act (WIOA) funds, awarded through DLLR, and the U.S. Department of Health and Human Services Temporary Assistance for Needy Family (TANF) grant funds, awarded by the State of Maryland's Department of Human Services. MCAT has also received funding from private philanthropic organizations, such as the Abell Foundation and Associated Black Charities.

In or about December 2016, PUGH stepped down as Chairman of the Board of Directors for MCAT. BROWN became the new Chairman of the Board, and PUGH assumed the position

of Ex-Officio Chair Emeritus of the Board. Prior to that time, BROWN held other positions at MCAT, including director and executive director.

In 2009, Roslyn WEDINGTON was hired as a student coordinator for MCAT. In 2012, WEDINGTON became the organization's executive director, a position she held until 2019. As executive director, WEDINGTON handled the day-to-day operations of MCAT, including, for example, what grants to pursue and what activities to undertake. She also handled the organization's day-to-day accounting. During WEDINGTON's tenure with MCAT, she was a full time salaried employee, never serving as an independent contractor.

From 2011 through 2018, BROWN was an authorized "Approver" for MCAT's payroll. On September 28, 2015, BROWN was given signatory authority over MCAT's bank account. Prior to that date, PUGH had held signatory authority over MCAT's bank account and signed MCAT checks.

As executive director, WEDINGTON tracked all the expenses for the organization, including the payroll. WEDINGTON routinely communicated with BROWN about the organization's expenses, including sending him expense summaries that included weekly payroll information. BROWN wrote checks to pay for those expenses and uploaded the employees' work hours to an electronic platform maintained by a payroll service provider hired by MCAT.

In 2011 and 2012, as it did for most of its employees, MCAT withheld funds from WEDINGTON's bi-weekly paycheck to pay state and federal taxes and contribute to the Social Security and Medicare programs. Upon receiving payroll information from BROWN, the payroll service provider calculated the necessary withholdings and electronically sent the funds to pay the taxes and make the contributions. At the end of both of those years, MCAT issued WEDINGTON an IRS Form W2, which detailed those withholdings.

**B.    The Scheme to Avoid Tax Withholdings**

In 2013, WEDINGTON's salary was garnished due to outstanding student loan debt and medical bills. In order to avoid further garnishments, WEDINGTON asked BROWN to take her "off payroll," which meant MCAT would no longer submit her name to the payroll service provider for the purpose of calculating withholdings from her salary; rather; she would be treated as an independent contractor. BROWN agreed to the arrangement.

Thereafter, BROWN no longer sent WEDINGTON''s payroll information to the payroll service provider. Instead, BROWN had MCAT make electronic ACH deposits into Brown's

personal account in an amount that exceeded the annual salary owed to WEDINGTON, which totaled more than $80,000 per year. In so doing, BROWN created the pretense that he was doing work for MCAT as an independent contractor. BROWN then wrote checks to WEDINGTON from his account and/or gave her cash equal to or greater than WEDINGTON's annual salary. Later, when BROWN obtained signatory authority over MCAT's bank account in September 2015, he began to issue checks to WEDINGTON outside MCAT's normal payroll process. WEDINGTON cashed the checks. As a result of this payment arrangement, which lasted from approximately 2013 until 2018, WEDINGTON was able to avoid all garnishments and payroll withholdings. Also because of this payment arrangement, MCAT did not issue a W-2 to WEDINGTON for any of those years.

### C. The Filing of False Tax Returns for WEDINGTON

For tax years 2013 through 2017, BROWN prepared and filed WEDINGTON's tax returns in exchange for a fee. All five of the Form 1040 tax returns filed for those years contained a written declaration that they were made under penalties of perjury. However, as BROWN and WEDINGTON well knew, each of those tax returns contained materially false information, including the omission of the annual salary WEDINGTON received from MCAT.

#### 1. 2013

For WEDINGTON's 2013 tax return filed on April 20, 2014, BROWN falsely reported that WEDINGTON did not receive income from MCAT that year. However, based upon the fraudulent compensation arrangement described above, they both knew that BROWN had paid WEDINGTON approximately $80,600 that year for her fulltime work as MCAT's executive director. The only income BROWN reported on WEDINGTON's 2013 tax return was $15,803 in unemployment insurance and $1,565 in state and local income tax refunds.

The knowing and willful omission of the income received from MCAT, as well as other false information BROWN included on the 2013 tax return, substantially reduced WEDINGTON's tax liability for that year. The false entries resulted in the issuance of a refund of $6,091 to which she was not entitled.

#### 2. 2014

For WEDINGTON's 2014 tax return filed on February 10, 2015, BROWN falsely reported that WEDINGTON did not receive income from MCAT that year. However, based upon the fraudulent compensation arrangement described above, they both know that BROWN had paid

WEDINGTON approximately $80,600 that year for her fulltime work as MCAT's executive director.

The only income BROWN reported on WEDINGTON's 2014 tax return was $50,000 in gross receipts to RRW Consulting LLC ("RRW"), a company WEDINGTON and BROWN organized to purportedly engage in the business of "Management Consulting." The $50,000 of business income purportedly received by RRW Consulting came from Stricker Abstracting, a title company owned by BROWN. However, WEDINGTON and BROWN both knew this was false because neither company was active that year. In addition, BROWN offset most of RRW's purported income by deducting fictitious business expenses totaling $32,283.

The knowing and willful omission of the income received from MCAT, as well as the other false information BROWN included on the 2014 tax return, substantially reduced WEDINGTON's tax liability for that year. The false entries resulted in the issuance of a refund of $4,957 to which she was not entitled.

### 3.    2015

For WEDINGTON's 2015 tax return filed on February 8, 2016, BROWN falsely reported that WEDINGTON did not receive income from MCAT that year. However, based upon the fraudulent compensation arrangement described above, they both knew that BROWN had paid WEDINGTON approximately $80,600 that year for her fulltime work as MCAT's executive director. Of that amount, BROWN directed MCAT's payroll provider to make direct deposit payments totaling $23,410 into a bank account in the name of WEDINGTON's son.

The only income BROWN reported on WEDINGTON's 2015 tax return was $27,000 in gross receipts to RRW Consulting LLC. The $27,000 of business income purportedly received by RRW came from BROWN's company, Stricker Abstracting. WEDINGTON and BROWN both knew this was false because neither company was active that year. BROWN offset most of the RRW's income by deducting fictitious business expenses totaling $16,872.

The knowing and willful omission of the income received from MCAT, as well as the other false information BROWN included on the 2015 tax return, substantially reduced WEDINGTON's tax liability for that year. The false entries resulted in the issuance of a refund of $3,774 to which she was not entitled.

### 4.    2016

For WEDINGTON's 2016 tax return filed on February 23, 2017, BROWN falsely reported that WEDINGTON did not receive income from MCAT that year. However, based upon the fraudulent compensation arrangement described above, they both know that BROWN had paid WEDINGTON approximately $84,200 that year for her fulltime work as MCAT's executive director.

The only income BROWN reported on WEDINGTON's 2016 tax return was $30,000 in gross receipts to RRW Consulting LLC. The $30,000 of business income purportedly received by RRW came from BROWN's company, Stricker Abstracting. WEDINGTON and BROWN both knew this was false because neither company was active that year. BROWN offset most of the RRW's income by deducting fictitious business expenses totaling $16,471.

The knowing and willful omission of the income received from MCAT, as well as the other false information BROWN included on the 2016 tax return, substantially reduced WEDINGTON's tax liability for that year. The false entries resulted in the issuance of a refund of $3,425 to which she was not entitled.

Furthermore, in 2016, BROWN and WEDINGTON prepared and submitted a false document to support an insurance claim. WEDINGTON filed a workers compensation claim against MCAT for an injury suffered while at work. As part of the claims process, the insurance carrier for MCAT, The Hartford, required that a "Statement of Wage Information" be submitted by MCAT. BROWN and WEDINGTON prepared a fraudulent wage statement that falsely reported that WEDINGTON received a weekly gross salary of $1,600 as an employee of MCAT, which after withholdings was reduced to a net weekly salary of $1,181. As a result of the workers compensation claim, Wedington received a settlement in the amount of $8,942.

### 5.    2017

For WEDINGTON's 2017 tax return filed on February 7, 2018, BROWN falsely reported that WEDINGTON did not receive income from MCAT that year. However, based upon the fraudulent compensation arrangement described above, they both knew that BROWN had paid WEDINGTON approximately $83,200 that year for her fulltime work as MCAT's executive director.

Unlike prior years, BROWN did not report gross receipts for RRW Consulting LLC. However, BROWN deducted fictitious expenses on RRW's Schedule C totaling $12,529,

generating a loss of $12,529. The knowing and willful omission of the income received from MCAT, as well as the other false information BROWN included on the 2017 tax return, substantially reduced WEDINGTON's tax liability for that year. The false entries resulted in the issuance of a refund of $1,000 to which she was not entitled.

6.    **Total Taxes Evaded as a Result of the Scheme**

By not reporting WEDINGTON's MCAT salary on her Form 1040 or W-2, BROWN helped WEDINGTON avoid the following taxes in the following years:

| YEAR | SALARY | TOTAL TAX |
|---|---|---|
| 2013 | $80,600.00 | $24,011.93 |
| 2014 | $80,600.00 | $23,889.08 |
| 2015 | $80,600.00 | $23,780.53 |
| 2016 | $84,200.00 | $25,177.53 |
| 2017 | $83,200.00 | $24,733.43 |
| | TOTAL | $121,592.50 |

## IV.    Count Four - Filing a False Tax Return for 2016

As previously noted, BROWN filed a U.S. Individual Income Tax Return, Form 1040, for tax year 2016 that falsely listed the $64,325 of Healthy Holly payments as business income on his Schedule C for GBJ Consulting. To offset that purported income, he deducted fictitious business expenses, including fake labor expenses for nonexistent employees in whose names he issued fraudulent Form 1099s. BROWN made other material misrepresentations in that year's tax return, including the use of fictitious income and expenses on the Schedule C filed for Stricker Abstracting, LLC.

## V.    The Preparation and Filing of other False Tax Returns

When not working as a legislative aide or mayoral staff member during 2016 through 2018, BROWN worked part time as a freelance tax preparer. BROWN charged a fee to prepare dozens of tax returns that he filed on behalf of his family, friends and associates. BROWN included materially false information in all of those tax returns to obtain larger refunds for his customers, including the calculation of net losses derived from fictitious Schedule C businesses. The undeserved refunds totaled more than $100,000.

I have read this Statement of Facts and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. I do not wish to change any part of it.

11/05/19

Date

_Gary Brown, Jr._

I am Gary Brown's attorney. I have carefully reviewed every part of this Statement of Facts with him. To my knowledge, his decision to sign it is an informed and voluntary one.

11/5/19

Date

Barry J. Pollack, Esq.