# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| **V.** : | **CRIMINAL NO. DKC-19-0524** |
| **GARY BROWN, JR.,** : | |
| **Defendant.** : | |
| : | |

...oooOooo...

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its counsel, Robert K. Hur, United States Attorney for the District of Maryland, and Martin J. Clarke and Leo J. Wise, Assistant United States Attorneys for said district, hereby submits its Sentencing Memorandum in the above-captioned case.

**I.      Introduction**

On November 6, 2019, the Office of the United States Attorney filed a four-count criminal Information against the defendant, Gary Brown. The Information capped a multi-year investigation of Brown's two longstanding conspiratorial relationships with his codefendants, former Mayor Catherine Pugh and Rosalyn Wedington.

A week later, on November 13, 2019, pursuant to a plea agreement, the defendant pled guilty to all four counts: Count One, conspiracy (with Pugh) to commit wire fraud, in violation of 18 U.S.C § 1349; Count Two, conspiracy (with Pugh) to defraud the United States, in violation of 18 U.S.C. § 371; Count Three, conspiracy (with Wedington) to defraud the United States, in violation of 18 U.S.C. § 371; and Count Four, filing a false tax return, in violation of 26 U.S.C. § 7206(1). Brown's sentencing hearing is scheduled for September 11, 2020 at 2:00 pm.

A.      **Stipulation to Statement of Facts and Advisory Guideline Range**

Pursuant to the plea agreement, the defendant stipulated to the applicability of various sentencing factors set forth in the U.S. Sentencing Guidelines ("USSG"). In accordance with the Guidelines' grouping rules for multiple offenses, the agreed upon sentencing guideline factors for the most serious offense are set forth below.

**Count One (conspiracy to commit wire fraud)**

| | |
|---|---|
| Base offense level (USSG §§ 2B1.1(a)(1), 2X1.1(a)) | 7 |
| Upward adjustment for **loss resulting from the offense** (more than $250,000 but less than $500,000) (USSG § 2B1.1(b)(1)(G)) | +12 |
| Subtotal | 19[1] |
| Upward adjustment for **sophisticated means** (U.S.S.G. § 2B1.1(b)(10)(C)) | +2 |
| Upward adjustment for **misrepresentation of actions on behalf of a charitable or educational organization** (U.S.S.G. § 2B1.1(b)(9)(A) | +2 |
| Grouping - **multiple count adjustment** | +2[2] |
| Subtotal | 25 |
| Downward adjustment for **timely acceptance of responsibility** (USSG 3E1.1(a) &(b)) | -3 |
| **Final adjusted offense level** | **22** |

---

[1] Pursuant to the initial stipulation, the parties reserved the right to argue for their respective positions regarding the loss amount. Subsequent to the Rule 11 hearing, the parties reached an agreement that the applicable upward adjustment for loss is 12 (not 14). Consequently, the adjusted offense level for loss is nineteen (19).

[2] The plea agreement mistakenly applied a 1.5-level upward adjustment for multiple counts. *See* Plea Agreement at ¶ (6)(h). The Presentence Investigation Report ("PSR") correctly applied a 2-level upward adjustment. *See* PSR at ¶ 117.

The applicable guideline range for an final adjusted offense level of 22 and a criminal history category of I is **41-51 months imprisonment.**

**B.** 



███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███

██████████████████████████████, the final adjusted offense level is 20 and the applicable guideline range is **33–41 months imprisonment**. In accordance with the sentencing guidelines, the statutory considerations under 18 U.S.C. § 3553(a), and the extensive criminal conduct to which Brown has pled guilty, **a guideline sentence of 33 months imprisonment** is warranted. For the reasons set forth below, a 33-month term of imprisonment provides an adequate and just punishment for Brown's longstanding involvement in multiple criminal schemes and serves to deter other would-be corrupt government officials.

**II.     The Law**

A sentence must be both procedurally and substantively reasonable. *United States v. Blue*, 877 F.3d 513, 517 (4th Cir. 2017), citing *Gall v. United States*, 552 U.S. 38, 41 (2007). Reasonableness "is not measured simply by whether the sentence falls within the statutory range, but by whether the sentence was guided by the Sentencing Guidelines and by the provisions of § 3553(a)." *Blue*, 877 F. 3d. at 517, quoting *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006). As the Fourth Circuit noted,

> [A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence. If the court imposes a sentence outside the guideline range, it should explain its reason for doing so.

*Green*, 436 F.3d at 455–56, citing *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

5

Pursuant to § 3553(a), the Court should "impose a sentence sufficient, but not greater than necessary" after considering all of the statutory sentencing factors. 18 U.S.C. § 3553(a). The sentencing factors the Court must consider are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established for--
>      (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

*Id*.

## III.    Argument

The Statement of Facts establishes that, over a period of about eight years, the defendant engaged in multiple criminal schemes. Sometimes he acted alone; sometimes he acted in concert with others. The facts underlying Brown's pursuit of financial gain and political influence reflect a persistent disregard for the law.

Moreover, Brown was employed continuously as a public servant during the execution of his schemes, and he used those paid positions to facilitate some of them. Specifically, during the entire eight-year period of ongoing criminal schemes between 2011 and 2019, Brown was either Pugh's legislative aide in the Maryland Senate or the Deputy Director of Special Events in the Mayor's Office. Also during that period, Brown was nominated to serve as a member of the Maryland House of Delegates to fill a vacancy created by Pugh's mayoral win in 2016.

In addition to his corrupt public service, Brown engaged in corrupt business practices while working as the Chief Operating Officer for Healthy Holly; the Chairman of the Board for MCAT; and as the owner of three businesses: Stricker Abstracting, GB Abstracting, and GBJ Consulting.

As more fully discussed below, the counts of conviction encompass four separate criminal schemes, which, at times, were executed simultaneously. Such an eight-year pattern of nonstop criminality necessitates a long period of imprisonment, one that will incrementally address Brown's extensive participation and unique role in each of the four schemes.

### A. The Four Criminal Schemes

#### 1. The Healthy Holly Scheme to Defraud

There were only two participants in the Healthy Holly scheme to defraud: the defendant and Catherine Pugh. Between the two of them, they ran a scam that endured for almost eight years. It raised more than $850,000 from the sale of 132,116 children's books (though only 73,232 copies were ever printed). Ex. 1 (Summary of Books Sold). Pugh bears most of the responsibility for the scheme because of her political stature and receipt of the sale proceeds. However, once the scheme was underway, the evidence clearly shows that Pugh relied heavily on Brown to help her execute it. She delegated virtually all the operational aspects of the scheme to Brown. Unquestionably, he was her right-hand man from start to finish.

Without Brown's behind-the-scenes supervision of the enterprise as Chief Operating Officer (COO), and without his unwavering commitment to Pugh to keep the scheme concealed for so long, they never would have succeeded in defrauding so many businesses out of so much money, nor advanced their careers the way they did. That success is largely because Brown embraced his conspiratorial role in defrauding nonprofit organizations. In furtherance of the conspiracy, he solicited buyers for the books; drafted the invoices; picked up the purchase checks;

7

sent follow-up emails; corresponded with the company's illustrator, copy editor and printer; stored books; transported books; scheduled book deliveries; hired movers; and deposited proceeds.

A lot of the work Brown did to advance the scheme took place during work hours while he was on the government payroll. As the person who oversaw the storage and inventory of the books, Brown enlisted the unwitting assistance of other public employees. Government vehicles driven by government employees transported books to events, and Brown himself made deliveries during work hours. Brown controlled access to pallets of books stored at the City Warehouse, and he routinely stored boxes of books at Pugh's legislative offices in Annapolis and Baltimore, as well as in City Hall. Brown also made sure that boxes of books for political handouts were in place at Pugh's campaign headquarters on North Charles Street.

In addition to overseeing the logistics of the scheme and doing the bookkeeping, Brown was empowered to represent the company's interests and resolve issues that might arise with the buyers who had been defrauded. For example, on February 1, 2017, in his role as COO, Brown wrote a letter to the President of Associated Black Charities to allay any concern she had about whether donated money would actually be used to get books into the hands of school children. In the letter, Brown falsely asserted that 5,000 copies of Book 3 would be sent to the Baltimore City Public School (BCPS) warehouse and then distributed to the BCPS students. *See* Ex. 2 (Letter to ABC). As Brown well knew at the time, the only copies of that book ever printed were already at the warehouse. They had already been purchased by a different buyer (UMMS), and there was no plan or intention to deliver the books to the students.

Similarly, Brown dealt directly with representatives of the other nonprofit organizations that he and Pugh defrauded. For example, on November 10, 2016, Brown solicited CareFirst to buy 1,000 books, and months later sent a follow-up email. *See* Ex. 3 (Email to CareFirst 11-10-

8

16) On November 22, 2017, Brown emailed a senior vice president at CareFirst (M.T.) "wondering if CareFirst would be interested in purchasing some of the Healthy Holly books written by the mayor . . ." Ex. 4 (Email to CareFirst 11-22-17)  He offered to sell the books directly to CareFirst or through a nonprofit 501(c) entity.  MT stated, "as you know we are prohibited from investing in for-profit entities . . . [however] if a nonprofit wants to purchase the books for use in their programming, we would be happy to consider the request [for money] directly from them." *Id*.  Remarkably, Brown offered MCAT as a surrogate nonprofit to facilitate the book sale, stating, "thanks for the fast response . . . I will have the nonprofit reach out with the request.  It will be from the Maryland Center for Adult Training." *Id*.  MCAT's nonprofit mission had nothing to do with the educating elementary school children, yet Brown did not hesitate to misuse his leadership position at the organization to close the fraudulent sale.

On September 21, 2016, Brown sent Kaiser Permanente an email reminding them of the payment that was still outstanding and the need to schedule a corresponding shipment of books. *See* Ex. 5 (Email to Kaiser)  Furthermore, in addition to drafting and sending invoices to UMMS over the years, Brown served as Pugh's liaison when she wanted to return $100,000 to UMMS after the press picked up the story.

In short, the foregoing facts establish that Brown and Pugh worked closely to promote the scheme for their joint benefit.  They could not have defrauded so many organizations over an eight-year period without Brown.  As the face of the company, Pugh was the one who lured customers to the scheme, but as the one in charge of operations, Brown managed the scheme.

    2.    **The Scheme to Conceal Illegal Campaign Contributions and Defraud the IRS**
        i.   **Violating Campaign Finance Laws**

In the midst of executing the Healthy Holly scheme, Brown and Pugh came up with a second criminal scheme to advance their careers. As Pugh's biggest supporter and campaign aide, Brown recognized how important it was for Pugh to be the mayoral candidate who raised the most money before the State Board of Elections issued its periodic campaign finance report. After brainstorming about how they could boost their reported donations prior to the deadline of January 13, 2016, Pugh suggested using straw donors paid from Healthy Holly's business account. In response, Brown volunteered to recruit members of his family to be straw donors and, ultimately, Pugh did the same. Later on, nonfamily members were recruited before the next campaign finance report came out.

Brown happily assumed the responsibility of being the scheme's bagman. While at campaign headquarters, Pugh issued Healthy Holly checks payable to Brown, and he took care of everything else. *See* Ex. 6 (Checks). Brown went to tellers at different bank branches to cash the checks (instead of depositing them), then distributed the untraceable cash to the straw donors or purchased debit cards. Approximately $35,800 was illegally funneled to the campaign in this manner, and the Court will never know the impact the inflated campaign finance reports had on the outcome of the close election. *See* Ex. 7 (Disposition of Healthy Holly checks)

### ii.   The Cover-Up

A few months after Pugh won the Democratic primary election, the Maryland State Prosecutor's Office issued subpoenas to Brown and members of his family. In a demonstration of his commitment to conceal the straw-donor scheme and preserve Pugh's electoral victory, Brown took extraordinary steps to prevent state and federal authorities from scrutinizing his criminal partnership with Pugh. First, to disguise the true purpose of the checks he received during the straw-donor scheme, Brown manufactured fake records to backstop a fictitious business

10

relationship between his "consulting" company (GB Consulting) and Healthy Holly. *See* Ex. 8 (Account Statement)  He painstakingly contrived an account statement that falsely reflected a three-year history of payments made for services rendered by his company. *Id*.  He also created thirty-three backdated invoices to correspond with the billings on the account statement. *See, e.g.,* Ex. 9 (Sample Invoices).  The fabricated documents reflected not only the scope of Brown's obstructive intent, but also how adeptly he could pivot during the execution of a criminal scheme to protect himself and his partner.

The apex of his commitment to the conspiratorial relationship came when state authorities uncovered part of the straw-donor scheme and charged Brown with violating campaign finance laws (the State Prosecutor's Office did not know about Pugh's involvement).  Instead of recognizing the state charges as an opportunity to disengage from Pugh, cooperate with the authorities, and pursue a different career, Brown recommitted to a future with Pugh. He chose not to talk to the authorities.  Instead, Brown went to a defense attorney referred Pugh referred him to and paid for (approximately $18,000 in legal fees), and then pled guilty without ever implicating Pugh.  In return, Pugh adamantly defended Brown before the press and kept him as a paid member of her staff for two more years until City Hall was raided in April 2019.

Brown's state conviction for the straw-donor scheme did not dissuade him from participating in the other three criminal schemes.  In fact, he assumed a larger role in the Healthy Holly scheme from October 2016 through 2018.  During that two-year period, he started earning a commission from the fraudulent sales of the books, and Pugh asked him to interact more with the buyers because of her mayoral responsibilities.

11

### iii. The Coordination of False Tax Filings

The second way that Brown concealed the straw-donor scheme from state and federal authorities was by filing false tax returns that misrepresented the relationship between Healthy Holly and GB Consulting. For the cover-up to succeed, Brown knew that both companies had to file false tax returns and maintain fake business records to convince state and federal authorities that the checks used to bankroll the straw-donor scheme were just routine transactions between the two businesses.

As already noted above, to make the payments look legitimate, Brown manufactured fictitious account statements and backdated invoices in the name of his company GB Consulting. *See* Exs. 8 and 9. In addition to the creation of those fake records in late 2016, Brown signed a phony independent contractor agreement between GB Consulting and Healthy Holly purporting to provide marketing and sales services promoting Healthy Holly's books and clothing line. *See* Ex. 10 (Contractor Agreement). The agreement was backdated to September 2014.

To further support the pretense of an ongoing business relationship, Brown filed tax returns for GB Consulting for 2016 that falsely characterized the receipt of the straw-donor checks as business income for services provided to Healthy Holly. The total amount of the straw-donor checks on his business return closely matched what Pugh falsely reported to the IRS as expenses paid to Brown's company for "outside services" to Healthy Holly in 2016. The synchronous filings were supported by a fraudulent 2016 Form 1099 report of miscellaneous income paid to Brown.

Reporting the contrived business relationship in the manner described above would have increased the amount of income tax that Brown owed for 2016. However, he made sure that did not happen by reporting fictitious business expenses that not only offset the straw-donor checks, but also created a nontaxable business loss. As further evidence of how Brown used his accounting

and tax acumen to perfect the cover-up, he backstopped those additional expenses by filing multiple Form 1099s for fictitious employees.

In sum, the facts underlying the foregoing Healthy Holly and straw-donor schemes establish that virtually every aspect of Brown's relationship with Pugh was based on a shared intent to defraud others for personal and political gain. Indeed, notwithstanding how they may have viewed their relationship, it developed into a long-term criminal partnership with mutual goals. Brown went from being a devoted minion in the early years to a reliable business associate, especially during and after the mayoral campaign. Therefore, although Brown was not an elected official at the time, he bears a great deal of responsibility for the consequences resulting from that illicit partnership, including the financial gains at the expense of others, the advancement of Pugh's career, and the public's loss of trust in government.

### 3. The Scheme to Create Tax-Free Employment for Rosalyn Wedington

The third criminal scheme that Brown managed involved the corrupt use of his position as Chairman of the Board for MCAT, a nonprofit organization based in Baltimore that accepted federal and state funds for career training. The scheme lasted for five years, and it had nothing to do with the Healthy Holly scheme or the straw-donor scheme.

Brown had signatory authority over MCAT's bank account, and he authorized the bi-weekly payroll. Beginning in 2013, Brown again applied his business experience and tax know-how to illegal ends by helping Rosalyn Wedington, the organization's executive director, to evade payroll taxes on her salary. For five years, Brown manipulated the payroll process at MCAT so Wedington's $80,000 annual salary as a fulltime employee would not be subject to tax withholdings. Using the same tactic he employed to conceal the straw-donor scheme described above, Brown mischaracterized MCAT's relationship with Wedington by claiming she was an

13

independent contractor who invoiced MCAT for her services. Thus, Brown created the pretense that MCAT was not required to withhold thousands of dollars in payroll taxes, and W-2s were not issued to Wedington.

In addition to creating a tax-free work environment for Wedington at MCAT, Brown prepared five years of false tax returns for Wedington that completely distorted her annual income. For tax years 2013 through 2017, not only did Brown exclude Wedington's annual salary from MCAT, he padded her tax returns with fictitious business expenses that resulted in her getting significant tax <u>refunds</u> for each of those years. In all, Brown's conspiracy with Wedington to defraud the IRS resulted in Wedington not paying at least $121,592 in federal taxes.

Finally, in 2016, Brown helped Wedington file a false claim for worker's compensation by signing off on a "Statement of Wage Information" that misrepresented Wedington's weekly salary and withholdings at the time of her alleged injury. As a result, Wedington received an $8,942 insurance settlement.

In short, for five years, Brown had no qualms about corruptly using his leadership positon at MCAT to help the organization's executive director evade taxes and commit insurance fraud.

### 4. The Scheme to Use a Tax Preparation Business to Defraud the IRS

Brown's fourth criminal scheme incorporated many of the same skill sets Brown employed in the other three schemes. Between 2016 and 2018, in addition to the money he earned while working for Healthy Holly and as a political staff member, Brown earned money as a freelance tax preparer willing to file fraudulent tax returns for a fee.

For the dozens of tax returns that he filed during those years, Brown deliberately used fictitious income and expense information to minimize taxable income and maximize refunds for all of his customers. For example, he claimed that his clients all owned businesses that never

existed. Brown concocted information about the fictitious businesses and reported it on his customers' IRS Schedule C business forms. In so doing, he always created a net business loss for his clients to offset income reported to the IRS by their employers. As a result of Brown's fraudulent tax preparation business, all of his clients received a refund, which totaled more than $100,000.

## IV.     Sentencing Recommendation

From defrauding numerous nonprofit organizations and the IRS out of large sums of money, to rigging a mayoral election, Brown engaged in an unbroken pattern of criminality that does not warrant a variant sentence. A sentence of 33 months imprisonment provides a just sentence to address all the different ways he put himself above the welfare of others and the law.

The sheer number of schemes Brown was able to get away with deserves a sentence that reflects his ever increasing, incremental criminal behavior over the eight-year period. Anything less than a Guideline sentence would, in effect, provide a discount that rewards his obstinate and obstructive conduct with a single lower sentence that ignores the consequences of four ongoing and distinct criminal schemes. In addition, a sentence that only considers a term of imprisonment relative to what Pugh received at her sentencing gives Brown a pass for the crimes he committed that were wholly unrelated to Pugh.

As noted above, Pugh's public stature and ownership of Healthy Holly means she was largely responsible for initiating the scheme and luring new victims. However, Brown was not a sycophant blindly following Pugh's lead. To the contrary, Brown initiated his own criminal schemes, and he had his own political ambitions. What started as a political alliance in 2011 quickly became a political criminal enterprise to serve both Brown and Pugh.

In 2011, Brown had enough political support to run for the office of Baltimore City Councilman. When he lost that election, he decided that his best chance to attain political influence was by hitching his wagon to Pugh's rising star. Brown also took a seat on the Democratic Central Committee for the 40th Legislative District. Over the succeeding years, Brown slowly made himself indispensable to Pugh. He proved his mettle, and got the dirty jobs done. By 2015, the year before the mayoral primary, Brown was a full-fledged partner in the fight for Pugh's political ascension in state and local government. He exhibited unshakeable dedication to her political advancement by any means necessary. He was her go-to man, her confidante, and partner in crime. With his assistance, Pugh rose to become the Majority Leader of the Senate.

Brown expected to be rewarded for the skill and loyalty he brought to their criminal enterprise. In return for his faithful commitment, Brown was able to maintain eight years of employment in his chosen field as a political staffer in the state legislature and City Hall, positions that gave him credibility in political circles and padded his resume′. Beginning in 2016, in addition to being paid to ride Pugh's political coattails, Brown received sales commissions from Healthy Holly.

However, the ultimate reward for Brown's criminal allegiance to Pugh was his appointment to the House of Delegates in late 2016. The appointment was meant to fill the vacancy created by Pugh's mayoral victory just a month earlier. As detailed above, the outcome of that election was partly the result of Brown's promotion of Healthy Holly and his facilitation of illegal donations to Pugh's mayoral campaign in the months leading up to the election.

Days before Brown was to take the oath of office, the Baltimore Sun reported Brown's indictment for violating state campaign finance laws.[3] Once that became public, the Speaker of

---

[3] Luke Broadwater, *Gary Brown, Aide to Baltimore Mayor Pugh, Charged with Making Illegal Campaign Contributions*, https://www.baltimoresun.com/maryland/baltimore-city/bs-md-ci-gary-brown-20170109-story.html.

the House canceled the swearing-in ceremony and the governor rescinded the appointment. But for those criminal charges, Brown would have assumed legislative power in the House of Delegates.

The long-term conspiratorial relationship between Brown and Pugh clearly shows what happens when public corruption goes unchecked – it gives rise to more corruption. A reasonable sentence in this case is one that holds Brown accountable, not just for his participation in the four criminal schemes, but for his role in undermining the electoral process for his own financial and political gain. Consistent with the sentencing factors under § 3553(a), a Guideline-sentence of 33 months imprisonment is one that will fairly and adequately address the gravity of Brown's criminal acts while also sending an appropriate message of deterrence to would-be corrupt politicians and government employees. Finally, a sentence of 33 months imprisonment will help restore the public's faith and trust in its institutions, especially for the citizens of Baltimore.[4]

                                                      Respectfully submitted,

                                                      Robert K. Hur
                                                      United States Attorney

By: _____/s/_____
      Martin J. Clarke
      Leo J. Wise
      Assistant United States Attorneys
      Office of the United States Attorney
      District of Maryland

---

https://www.baltimoresun.com/maryland/baltimore-city/bs-md-ci-gary-brown-20170109-story html
[4] The government also respectfully requests an order of restitution for $411,948, which is the amount of the actual, total loss caused by the scheme alleged in Count One of the Information.

CERTIFICATE OF SERVICE

This is to certify that on this 28$^h$ day of August 2020, a copy of the foregoing *Government's Sentencing Memorandum* was electronically filed and made available to counsel of record.

_____/s/_____
Martin J. Clarke
Assistant United States Attorney